166 F.3d 374
 Fed. Carr. Cas. P 84,083, 334 U.S.App.D.C. 246
 AMERICAN TRUCKING ASSOCIATIONS, INC., et al., Petitioners,
v.
UNITED STATES DEPARTMENT OF TRANSPORTATION, Federal Highway
Administration, and United States of America,Respondents.
Petroleum Marketers Association of America, Intervenor.
 Nos. 97-1668, 97-1680.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 3, 1998.
Decided Feb. 12, 1999.
 
 On Petitions for Review of an Order of the United States Department of Transportation.
 Erika Z. Jones argued the cause for petitioners American Trucking Associations, et al. With her on the briefs were Daniel R. Barney, Lynda S. Mounts and Harold S. Reeves.
 Anthony J. McMahon argued the cause and filed the briefs for petitioner Truckers United for Safety. Mary Beth L. Jackson entered an appearance.
 Edward R. Cohen, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were Frank W. Hunger, Assistant Attorney General, and Robert S. Greenspan, Attorney. E. Roy Hawkens, Attorney, entered an appearance.
 Robert S. Bassman and Alphonse M. Alfano were on the brief for intervenor Petroleum Marketers Association of America.
 Before: WALD, WILLIAMS and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 The petitioners in this case, the American Trucking Associations ("ATA") and Truckers United for Safety ("TUFS"), challenge a rule promulgated by the Federal Highway Administration ("FHWA") amending the regulations governing the assignment of safety fitness ratings to motor carriers. The ATA claims that the amended regulations are contrary to law, are arbitrary and capricious, and were adopted without adequate consideration of comments. TUFS claims that the rule is invalid because it fails to discharge all the duties assigned the agency by the governing statute. Intervenor Petroleum Marketers Association of America raises still further complaints. We reject all these challenges. In addition, TUFS petitions us to vacate all existing safety fitness ratings. We find that TUFS lacks standing to pursue this claim. We thus deny the petitions on all counts.
 
 I. Background
 
 2
 The Motor Carrier Safety Act of 1984, as amended,instructs the Secretary of Transportation to prescribe regulations establishing a procedure for determining the safety fitness of owners and operators of commercial motor vehicles. See 49 U.S.C. § 31144(a)(1). The Secretary has delegated responsibility under this provision to the FHWA, which exercised it in 1988 by adopting Safety Fitness Procedures. See 53 Fed.Reg. 50,961 (1988).
 
 
 3
 In MST Express v. Department of Transportation, 108 F.3d 401 (D.C.Cir.1997), we held that the FHWA's 1988 action had failed to meet the statute's requirement of establishing its safety fitness rating methodology by regulation. Too much of its methodology was stated in its Safety Fitness Rating Methodology ("SFRM"), which was merely part of its Motor Carrier Training Manual and had not been adopted by notice-and-comment rulemaking. Id. at 406. The FHWA responded by issuing the rule challenged in this case, incorporating a nearly identical SFRM as an appendix to the Safety Fitness Procedures. 62 Fed.Reg. 28,826, 28,826 (1997). The alleged inadequacy of the SFRM is the gravamen of most of the petitioners' challenges.
 
 
 4
 The SFRM states a procedure for assigning a motor carrier a safety rating of "satisfactory," "conditional," or "unsatisfactory." The rating depends on the carrier's ratings in six specific "factors."
 
 
 5
 Five of these factor ratings are based on compliance with safety regulations in various areas--"general," "driver," "operational," "vehicle," and "hazardous materials." 49 CFR App. B, 62 Fed.Reg. 60,035, 60,045 (1997). The ratings for four of these--all but the vehicle factor--are determined by a "compliance review" of the carrier's documents by FHWA inspectors. Id. at 60,044-45. The rating for the vehicle factor is based at least in part on document review, and can also be affected by the results of roadside inspections. Id. at 60,044. The rating for the sixth factor, accidents, is determined by the carrier's accident rate. Id. Each factor is rated on the same scale as the overall rating (satisfactory, conditional, or unsatisfactory), and the six individual factor ratings are combined into an overall safety rating according to the following table:
 
 
 6
 MOTOR CARRIER SAFETY RATING TABLE
---------------------------------------------
 Factor ratings Overall safety
 rating
---------------------------------------------
Unsatisfactory .. Conditional
---------------------------------------------
0 ............... 2 or less Satisfactory
0 ............... more than 2 Conditional
1 ............... 2 or less Conditional
1 ............... more than 2 Unsatisfactory
2 or more ....... 0 or more Unsatisfactory
---------------------------------------------
 
 
 7
 49 CFR 385 App. B.
 
 
 8
 We describe specific aspects of the SFRM in more detail in the discussion of each challenge.
 
 II. ATA's Claims
 A. Consistency with Statute
 
 9
 The ATA's first claim is that the rule fails to comply with the statute, principally for want of what ATA regards as statutorily mandated specificity. When the present rule was issued, and when this action was brought, the relevant statutory provision was contained in 49 U.S.C. § 31144(a)(1), which instructed the Secretary to "prescribe regulations establishing a procedure to decide on the safety fitness" of carriers, including a "means of deciding whether [carriers] meet the safety fitness requirements under clause (A)," which in turn called for "specific initial and continuing" safety requirements. Id. Although none of the parties mentioned it in briefing or oral argument, 49 U.S.C. § 31144 was amended by the Transportation Equity Act for the 21st Century ("1998 Act"), § 4009(a), Pub.L. No. 105-178, 112 Stat. 107, 405-07. The requirement at stake here is reformulated as § 31144(b) and now demands that the Secretary "maintain by regulation a procedure for determining the safety fitness" of carriers, which must include "specific initial and continuing" safety fitness requirements and a "methodology the Secretary will use to determine" whether carriers are fit. Id. As we develop below, the change has no effect on the outcome.
 
 
 10
 In its specificity claim, ATA points out that the SFRM decrees neither how many documents a Safety Investigator is to examine nor how the investigator is to select the documents he or she does review. ATA reads MST Express as saying that the statute requires that all procedures used in assessing safety fitness be "completely contained" in the regulations, so as to enable carriers to "predict," "ascertain in advance," or "determine from looking at the current regulations," the safety ratings they will receive if inspected.
 
 
 11
 Whether the FHWA's regulations satisfy the statutory directive is a question of statutory interpretation, one the FHWA has answered by adopting the regulations in question. Under the familiar test of Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), assuming Congress has not "directly spoken to the precise question at issue," id. at 842-43, 104 S.Ct. 2778, we defer to the agency's interpretation if it is "based on a permissible construction of the statute," id. at 843, 104 S.Ct. 2778. The Chevron test applies to issues of how specifically an agency must frame its regulations. New Mexico v. EPA, 114 F.3d 290, 293 (D.C.Cir.1997).
 
 
 12
 Here neither the 1984 Act's term, "means of deciding," nor that of the 1998 Act, "methodology," could possibly be said to speak directly to the necessary degree of specificity (at least in any sense adequate to condemn the present regulations). Nor does the statutory mandate that requirements be "specific" illuminate the degree of specificity required. Thus, we turn to the question of whether it is reasonable to call the procedures a "means of deciding" whether carriers meet "specific" safety fitness requirements (1984 Act) or a "methodology for determining the safety fitness" of carriers (1998 Act), again with reference to "specific" requirements. In a series of cases we have explicitly accorded agencies very broad deference in selecting the level of generality at which they will articulate rules. See New Mexico v. EPA, 114 F.3d at 294; Metropolitan Washington Airports Authority Professional Fire Fighters Ass'n v. United States, 959 F.2d 297, 300 (D.C.Cir.1992); Natural Resources Defense Council v. EPA, 907 F.2d 1146, 1165 n. 16 (D.C.Cir.1990).
 
 
 13
 In fact the SFRM is highly specific, as we noted in MST Express. There, contrasting it with the far more limited treatment of the method for assigning ratings in the Safety Fitness Procedures, we said that the SFRM "provides FHWA inspectors with detailed guidelines for deriving a motor carrier's safety rating." 108 F.3d at 403. It enumerates the specific safety regulations that are considered in a compliance review, divides them into "acute" and "critical" categories,[1] notifies the carrier of the types of records that are reviewed for compliance, and explains exactly how detected violations of acute and critical regulations are combined into an overall safety rating.
 
 
 14
 Yet ATA is certainly correct in claiming that the SFRM fails to specify how many documents are examined for compliance or how the documents that are reviewed are selected. But that gap hardly compels a finding that it fails to meet the specificity requirement of the statute as construed in MST Express. Indeed, that case implied that the SFRM did satisfy the statutory mandate, observing that "it is not apparent from the regulations--as opposed to the SFRM--under what circumstances a carrier should expect to receive a conditional or an unsatisfactory rating." 108 F.3d at 406. At the time of this accolade the SFRM did not contain the prescription of sampling procedures that ATA now claims is indispensable. In fact, the SFRM's specificity has not in any way been degraded since MST Express.
 
 
 15
 The ATA cites MST Express's statement that "[a] motor carrier or operator looking at the current regulations cannot determine ... what safety fitness rating it will receive." Id. But the regulations condemned in MST Express gave no guidance at all as to when inspectors would give a poor safety rating, providing only that a satisfactory rating would be awarded if a carrier had "adequate" safety management controls. Id. at 403. "Adequate" was defined in turn as "appropriate for the size and type of operation of the particular motor carrier." Id. Thus the case can hardly be read to support the ATA's theory that it required specificity to the point of laying out a totally deterministic process. A better reading is that it merely reflects a rule, suggested in New Mexico v. EPA, that when a regulation intended to apply a standard "contribute[s] no extra specificity or clarity" to the standard it implements, the agency has failed "[to do] the intended job." 114 F.3d at 293.
 
 
 16
 As a practical matter, ATA points to no way in which the overall purpose of the Act--promoting motor carrier safety, subject of course to protecting carriers' rights--calls for a promulgation of every detail of the sampling process by regulation. It is easy to imagine an affirmative reason for the agency's decision not to subject the sampling procedure to notice and comment rulemaking--the desire to be able to vary these technical elements of the process without excessive delay as experience accrues.
 
 
 17
 Although the FHWA did not defend the decision not to incorporate sampling procedures into the regulations on those grounds in the rulemaking proceedings, neither the ATA nor TUFS argued that it must place the sampling procedures there. The ATA did "urge FHWA to include random record sampling as a component of the final rule establishing a new safety rating methodology." But ATA was arguing that FHWA should use random sampling instead of the "focused sampling" technique the agency ultimately adopted, not that the statute required the selected technique to be described in a regulation rather than in the Field Operations Training Manual, where it in fact appeared. Since the petitioners did not say why the agency was required to put its sampling method into the regulation, we cannot fault the agency for failing to explain its decision. "[A] zero argument deserves a zero response." ParkView Medical Assocs. v. Shalala, 158 F.3d 146, 149 (D.C.Cir.1998).
 
 
 18
 In New Mexico v. EPA, in rejecting a demand for greater detail, we said that "[e]verything else being equal, the better a petitioner can demonstrate the feasibility of greater specificity the more convincing its attack on agency vagueness," and that "where the agency itself has adopted highly specific internal guidelines governing the same subject, it cannot very plausibly deny feasibility." 114 F.3d at 294 (emphasis omitted). There we cited MST Express, where, of course, the detail in the SFRM showed that the agency could handily achieve far greater specificity than the Safety Fitness Procedures contained. Here, as the FHWA's manual does contain procedures almost as detailed as those the ATA would require, see Federal Highway Administration, Field Operations Training Manual, ch. 3 (1997), naturally the FHWA's exclusion of the sampling procedures from the notice-and-comment regulations cannot be grounded in infeasibility. But it need not be. The agency's broad discretion and the reasonableness of its choice are enough.
 
 
 19
 B. Failure to Require a Statistically Significant Sample
 
 
 20
 The ATA's second claim is that the FHWA arbitrarily failed to require random selection of a statistically significant sample of records for review. Instead, the FHWA chose to use a "focused sampling" technique, set forth in its publicly available Field Operations Training Manual. The Manual instructs investigators to "[i]dentify and list drivers and vehicles that have been involved in accidents and drivers and vehicles found in violation during roadside inspections. These drivers and vehicles will be used to focus the review...." Federal Highway Administration, Field Operations Training Manual, ch. 3, at 4. Investigators are also to focus on drivers cited for hours-of-service violations when determining the level of compliance with those regulations. Id. at 10. It is undisputed that the records and vehicles examined first under the agency's "focused sampling" procedure are more suspect--that is, more likely to exhibit violations than randomly selected records and vehicles. It follows that the agency will find a higher violation rate using focused sampling than it would if it used the random method petitioners favor.
 
 
 21
 According to the ATA, compliance reviews under the rule do not produce a "representative picture of a carrier's safety fitness." Because random sampling is not required, the ATA argues, a "skewed sample" may produce a "skewed understanding of a carrier's safety management controls." In the ATA view the FHWA therefore fails to achieve its avowed purpose, the creation of "a reasonable approach for assigning a safety rating which best describes the current safety fitness posture of a motor carrier as required by the safety fitness regulations." 62 Fed.Reg. 60,035, 60,045 (1997).
 
 
 22
 ATA appears to assume that any rational system must estimate the proportion of violations to be found in the total population of a carrier's documents. We agree, of course, that if everything else were equal, information about this proportion would be useful. But other measures are also useful, and the agency may--if it has some reason--rationally prefer them.
 
 
 23
 The data yielded by the FHWA method have value, certainly for ranking carriers. It is true that a 15% violation rate in a sample composed partly or wholly of suspect documents does not support the inference that the violation rate for the entire document population is 15%. But the fact that the suspect-document population rate is not equal to the overall violation rate and does not mean the two rates are not correlated. GDP and personal consumption are correlated, though hardly equal. It seems reasonable to believe that carriers with higher observed violation rates under FHWA's system--drawing a sample of suspect documents first, with (for many factors) minimum sample numbers based on size of carrier--will generally have higher overall violation rates.
 
 
 24
 It is true that some carriers will have a higher proportion of suspect documents than others. But this does not destroy the value of FHWA's method. Consider two carriers of equal size, X and Y, where the sample from X has the higher observed violation rate. It is reasonable to infer that X's overall violation rate is higher regardless of which carrier has more suspect documents. To illustrate, we present two limiting cases: In Case 1, X has so many suspect documents that the X sample is entirely made up such records, while Y has no suspect documents. In this case, the carrier with more suspect documents (i.e., more roadside violations, accidents, etc.) unsurprisingly has a higher violation rate. In Case 2 we assume the reverse--that X's sampled documents are all nonsuspect and Y's are all suspect. X's non-suspect documents show a higher violation rate than Y's suspect documents. The result is a little surprising, but all it means is that is that in this particular instance "suspectness" turned out not to have been a good proxy for violation rate for those two carriers. The inference that X was the worse violator is not impaired.
 
 
 25
 Part of ATA's problem arises from a misreading of the rules. The SFRM says that "[w]hen a number of documents are reviewed, the number of violations required to meet a pattern must be equal to 10 percent of those examined." 62 Fed.Reg. 60,035, 60,044 (1997). ATA acts as if this meant that an overall 10 percent rate of noncompliance with a critical regulation is satisfactory. If that were true, it would follow that only a sampling procedure aimed at estimating the total rate of noncompliance would be rational. But the total rate is not the standard. Rather than setting the acceptable noncompliance rate at 10 percent of what all documents would show, the SFRM sets it at 10 percent among examined documents.
 
 
 26
 As we said, the agency must of course have some reason for preferring focused over random sampling. It did. In the statement accompanying promulgation of the final rule, the FHWA defended its decision on the grounds that "it is in the best interest of public safety to continue to focus its limited resources on drivers and vehicles most likely to be in violation of the regulations." 62 Fed.Reg. 60,035, 60,039 (1997).
 
 
 27
 To understand the FHWA's rationale, it is helpful to understand the distinction that the agency draws between "acute" and "critical" regulatory violations, a distinction unchallenged here. The FHWA defines acute regulations as those with respect to which "noncompliance is so severe as to require immediate corrective actions by a motor carrier regardless of the overall safety posture of the motor carrier." 49 CFR 385 App. B, II(b), 62 Fed.Reg. at 60,044. An example is 49 CFR § 382.201, which (motorists may be cheered to read) prohibits knowing use of a driver with a blood alcohol concentration of 0.04% or greater. 49 CFR 385 App. B, VII, 62 Fed.Reg. at 60,045. Each instance of an acute violation affects the relevant factor rating. 49 CFR 385 App. B, II(g), 62 Fed.Reg. at 60,044. Critical regulations are defined as those with respect to which "noncompliance relates to management and/or operational controls. These are indicative of breakdowns in a carrier's management controls." 49 CFR 385 App. B, II, 62 Fed.Reg. at 60,044. An example is 49 CFR § 391.45(b), which prohibits carriers from using a driver who has not been medically examined and certified during the past 24 months. 49 CFR 385 App. B, VII, 62 Fed.Reg. at 60,046. Violations of critical regulations do not affect the safety rating in the relevant factor unless a "pattern of noncompliance" is observed. There is no "pattern of noncompliance" unless 10% of reviewed documents, and at least two documents, show violations. 49 CFR 385 App. B., II(g), 62 Fed.Reg. at 60,044 (1997). For acute violations the reasonableness of choosing focused over random sampling is clear. Even a single acute violation is serious enough to require "immediate corrective actions" and to affect the carrier's safety rating for the relevant factor.[2] Thus it is eminently reasonable for the FHWA to adopt a method designed to miss as few such violations as possible. Examining the documents and vehicles most likely to exhibit violations does so.
 
 
 28
 The FHWA's rationale is less obvious for critical violations, because the agency has decided that a violation rate below 10% will not affect the safety rating. Why not require random sampling but impose a lower tolerance threshold? The agency's answer is that by using a technique likely to detect as many violations as possible, it can most effectively discover areas requiring carriers' attention so that carriers can improve compliance and thus, presumably, safety. Random sampling is less effective in accomplishing this goal. Although this reasoning does not emerge with limpid clarity from the relevant pages of the Federal Register, the agency's concern with husbanding resources for maximum safety effect and fostering full compliance is evident. See 62 Fed.Reg. at 60,039. The ATA says that trying to locate problems is justifiable only for enforcement activities, not for assigning safety ratings. But even in choosing among safety rating methods it makes sense for the agency to look to the overall goal of the statute, namely safety.
 
 
 29
 ATA can make no claim that the agency's methodology makes the resulting ratings unsuitable for their ultimate use. They are made "available to other federal agencies and to the public," MST Express, 108 F.3d at 403, and, as we have said, there is no showing that the system produces skewed rankings. The direct legal effects have been limited. In the past, the only apparent legal consequence has been that the recipient of an "unsatisfactory" rating has been prohibited from "operating a commercial motor vehicle to transport ... [h]azardous materials ... or [m]ore than 15 passengers." 49 CFR § 385.13(a). The 1998 Act expands the effect, prohibiting any unfit owner or operator from operating motor vehicles in interstate commerce starting 60 days after the determination. See Pub.L. No. 105-478, § 4009(a), 112 Stat. 107, 405-06 (1998) (to be codified at 49 U.S.C. § 31144(c)(1)). ATA has not shown that the system will produce an unfitness rating that is arbitrary.
 
 
 30
 Part of ATA's objection on the sampling issue is that the SFRM fails to specify how far inspectors are to go in plowing through a carrier's documents. This flexibility produces the possibility that an inspector could manipulate the process. Consider two carriers, each with 1000 documents, which the inspector attacks worst first, with violations (in each case) showing in the first ten but not beyond. If the inspector looks at 100 for carrier A and 106 for carrier B, that choice alone (assuming ordinary rounding practices) puts A but not B on the wrong side of the 10 percent divide.
 
 
 31
 To some extent the Manual addresses this problem by setting minimum levels of document review for specific types of rules. See Federal Highway Administration, Field Operations Training Manual, ch. 3 (1997), at 5-6 (driver factor regulations), 7-9 (operational factor regulations), 9-10 (operational factor regulations). For these categories of records, the minimum levels get at the most troubling aspect of the problem--the chance that an inspector who had it in for a particular carrier might condemn it to an unsatisfactory rating by stopping at a very low number of documents.
 
 
 32
 The Manual does not prescribe an upper limit on the number of documents to be reviewed. But it does guide the inspector's decision to expand the review, stating that additional driver files are to be reviewed "if the focused review indicates substantial noncompliance," id. at 6, and that "increased attention may be required in certain areas of a carrier's operation that have revealed noncompliance." Id. at 10. Since inspections that include extra documents focus on problem areas, they are unlikely to yield systematically better ratings for more extensively scrutinized operators. In the terms of the Carrier A/Carrier B hypothetical, the six additional Carrier B documents reviewed will be in problem areas, so there is little reason to believe they are less likely to show violations than the first 100. It was reasonable for FHWA to suppose that a system that imposes a rigid constraint on the extent of the review would yield less accurate ratings than one that allows inspectors to probe areas that they judge suspicious.
 
 
 33
 Furthermore, forcing the agency to specify an upper limit on the extent of each review runs counter to the general principle that courts are ill-positioned to scrutinize an agency's allocation of its scarce resources. See, e.g., Heckler v. Chaney, 470 U.S. 821, 827, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).
 
 
 34
 The discretion that FHWA's scheme confers on inspectors can be abused, of course; intentionally and arbitrarily discriminatory enforcement of a statute can be unconstitutional. See Brandon v. District of Columbia Board of Parole, 823 F.2d 644, 650 (D.C.Cir.1987). But we can see no basis for restricting agents' discretion on the mere assumption--completely unsupported by factual allegations--that otherwise inspectors will act in bad faith.
 
 
 35
 The ATA also makes a procedural claim here--that the notice-and-comment rule is defective because it specifies no sampling procedure at all; only the Manual does so. Insofar as this is just a repeat of its early claim, our prior discussion is the answer. Beyond that claim, ATA offers no supporting reason. Here we review whether the current system for assigning ratings is arbitrary. If the FHWA changes its policy, actions under the new policy will be subject to the same standard of review.
 
 C. Treatment of Hours-of-Service Violations
 
 36
 In its final challenge ATA claims that the FHWA's treatment of violations of its "hours-of-service" regulations is unduly harsh.
 
 
 37
 Outside the hours-of-service area, a carrier is assessed one "point" for each violation of an acute regulation and one for each pattern of violations of a critical regulation.[3] 49 CFR 385 App. B, II(g), 62 Fed.Reg. 60,035, 60,044 (1997). But for the regulations governing drivers' hours of service, 49 CFR 395, a pattern of noncompliance (located within the "operational" safety factor) costs the carrier two points. Id. Each "point" received with respect to a given factor reduces the rating in that factor by one level--from satisfactory to conditional or from conditional to unsatisfactory. 49 CFR 385 App. B, II.C(b), 62 Fed.Reg. at 60,045.
 
 
 38
 The ATA argues that this double assessment is irrational because it amounts to disparate treatment of "functionally indistinguishable" violations. Its best claim on this point is that the FHWA's explanation of the rule merely defends enforcement of the hours-of-service regulation--without explaining why patterns of violation of that rule deserve to be treated more harshly than violations of other critical regulations.
 
 
 39
 What the agency did say, however, was enough. We look at the decision to assign two points to patterns of violation of the hours-of-service regulations in the context of the agency's overall process for turning observed violations into a rating. First, the types of regulatory default that an inspection turns up are of widely varying seriousness. This variation is captured to some extent by the critical-acute distinction, but there is also a good deal of variation among the regulations designated critical. For instance, failing to maintain a medical examiner's certificate in a driver's qualification file is a critical violation. 49 CFR 385 App. B, VII, 62 Fed.Reg. at 60,046 (1997). ATA's theory that all the critical violations are "functionally indistinguishable" would require us to say that failing to maintain a medical examiner's certificate is no different from exceeding the maximum allowable daily driving time; this is transparently not the case.
 
 
 40
 Even after rejecting the ATA's argument that all critical violations are functionally indistinguishable and must be treated identically, we must consider whether the decision to assign two points for hours-of-service violations is rational in the context of the rating system as a whole. The core aspects of the context are the division of regulations as between acute and merely critical, the number of regulations governing any subject matter (such as hours of service), and the distribution of subject-matter regulations among the six safety factors.
 
 
 41
 To illustrate the effect of context, we compare the regulations governing fatigue with the regulations governing drug and alcohol use and testing. There are three substantive and four recordkeeping hours-of-service regulations that affect each carrier. The substantive ones are the daily driving rule, 49 CFR § 395.3(a)(1), the daily on-duty rule, id. § 395.3(a)(2), and the weekly on-duty rule, id. § 395.3(b). The recordkeeping rules require that records of duty status be created, id. § 395.8(a), forwarded to the carrier's home office, id. § 395.8(i), maintained there for six months along with supporting documents, id. § 395.8(k)(1), and not falsified, id. § 395.8(e). Even an unsatisfactory rating for the "operational" factor (where all these violations are located) would not in itself lower a carrier's rating below "conditional"; a carrier can earn a conditional overall rating even with an unsatisfactory rating on a single factor. See Motor Carrier Safety Rating Table, supra, at I.B. By contrast, drug and alcohol matters are the subject of no fewer than eight acute (and two critical) regulations in the "driver" factor, and three more acute regulations in the operational factor. Because two separate factors include drug-and-alcohol limits, failure to comply with them can in itself cause a carrier to receive an unsatisfactory rating, while failure to comply with hours-of-service regulations cannot. Furthermore, there are more than twice as many ways for failure to comply with drug rules to cause points to be assessed. Finally, because most of these drug and alcohol rules are designated acute, they have no 10 percent safe harbor.
 
 
 42
 Indeed, it would be plausible to argue that the SFRM treats fatigue too leniently. One study in the record indicates that fatigue was the "probable primary cause" of 41% of studied accidents, while alcohol impairment was involved in only 4% of studied accidents; drug use was apparently not a factor in any of the studied accidents. See Transportation Research and Marketing, A Report on the Determination and Evaluation of the Role of Fatigue in Heavy Truck Accidents 14 (1985).
 
 
 43
 The FHWA's decision, then, was not just to assess two points for patterns of violation of the hours-of-service regulations, but also to label none of those regulations acute and to confine all of them to the operational factor. In light of the conditions the FHWA faced in crafting this element of the SFRM--the importance of controlling fatigue, the fact that the hours-of-service regulations are the only ones dealing with fatigue--we find no irrationality. And the agency pointed to each of these factors in justifying its decision. See 62 Fed.Reg. 28,826, 28,829 (1997), 62 Fed.Reg. 60,035, 60,040 (1997). Although the agency's defense may be of "less than ideal clarity," its "path may be reasonably discerned." Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Further, the agency's treatment of the issue constituted an adequate response to critical comments.
 
 
 44
 The ATA also argues that the FHWA should have considered the weakness of the relationship between hours-of-service violations and fatigue in determining how much weight to assign fatigue-related violations. The record indicates that the FHWA did consider this factor and recognized that the present rules may not target hours of service optimally. 62 Fed.Reg. 60,035, 60,040 (1997) ("[U]ntil the ongoing rulemaking efforts to better regulate fatigue are concluded, the FHWA believes it is important to continue to assign two points for a pattern of violations of a Part 395 'critical' regulation.") That there are flaws in the current substantive regulations does not, given the evidence indicating that long periods of driving cause accidents, render the agency's treatment of the rules arbitrary and capricious. See Patrick Hamelin, Surveys about Professional Truck Drivers: Professional Characteristics of Truck Drivers: Situations, Conditions and Duration of Work: Road Safety Effects 4 (1990) ("over-risk of involvement in accidents beyond ten and more hours of work span"); NTSB, Safety Study: Fatigue, Alcohol, Other Drugs, and Medical Factors in Fatal-to-the-Driver Heavy Truck Crashes 78 (1990) ("Research evidence indicates that accident rates for trucks tend to increase dramatically the longer the driver continues beyond 8 hours of continuous driving.").
 
 III. TUFS' Claims
 
 45
 A. Failure to Establish Safety Fitness Procedures for New Carriers
 
 
 46
 TUFS argues that the FHWA has failed to promulgate "specific initial and continuing requirements" for motor carriers to prove safety fitness as required by § 31144. Its focus, in fact, is on the word "initial"; no one could seriously argue that the FHWA has failed to promulgate "continuing" requirements for carriers already in operation.
 
 
 47
 Although the Secretary does not raise the issue of standing it is our duty to do so where it is questionable. See, e.g., Catholic Social Service v. Shalala, 12 F.3d 1123, 1125 n. 2 (D.C.Cir.1994). Here, though it is surely questionable, TUFS passes--if barely. TUFS describes its members as "various business entities whose operations subject them to federal regulation of interstate trucking," and complains that the FHWA's regulations "cannot be used to keep dangerous trucking companies out of interstate operation." We infer a claim that TUFS' members are particularly exposed to injury from unsafe truckers, although TUFS does not itself make the connection. Such a claim satisfies both the Constitutional and prudential standing requirements to bring a suit under a highway safety statute, as we held in International Brotherhood of Teamsters v. Pena, 17 F.3d 1478, 1482-83 (D.C.Cir.1994).
 
 
 48
 The FHWA does have a safety-related requirement in place to determine whether a carrier's application for new carrier authority should be approved. Carriers are required to provide proof of financial responsibility. 49 CFR § 365.109(a)(5) (1997). This is relevant to safety; indeed, operating a vehicle without "minimum levels of financial responsibility" is an acute violation of safety regulations, and failure to maintain proof of financial responsibility is a critical violation. See 62 Fed.Reg. 60,035, 60,045 (1997). It is a modest safety fitness requirement, to say the least, but of course it is designed for new carriers, which by definition lack a record on which to base a safety determination. In the absence of any suggestion from TUFS as to what an adequate safety rating system for new carriers ought to entail, we are in no position to hold the FHWA's system insufficient. TUFS directs none of its fire to the issue of carriers that in some degree represent continuations of prior carriers, possibly with a bad record, so we need not address it.
 
 
 49
 TUFS also claims that it is "unconscionable that the government has no legal means to shut down dangerous operations." While this may have been true, it was not because of the FHWA's regulations. The 1984 Act conferred no such power on the agency. The 1998 Act does confer it, see Pub.L. No. 105-178, § 4009(a), 112 Stat. 107, 405-06, to be codified at 49 U.S.C. § 31144(c)(1). As we said earlier, none of the parties even mentioned the 1998 Act, and in any event a judgment aimed at pushing the FHWA into action under the 1998 Act would be premature, as the Act is less than nine months old. In fact the Secretary appears to have been taking steps to implement his new powers. See 63 Fed.Reg. 49,630, 49,631 (1998) (request for comments on 1998 Act implementation encouraging "all interested parties to submit written comments through November 22 on any TEA-21 provision").
 
 B. Invalidation of Existing Safety Ratings
 
 50
 TUFS also argues that this Court's decision in MST Express requires the invalidation of all existing safety ratings. TUFS lacks standing to raise the issue, however. It asserts no basis for organizational standing other than that its purposes include promotion of the "just and efficient administration of federal highway safety statutes," a generalized interest that is plainly inadequate. See Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). And it does not claim that any of its members has suffered or is about to suffer injury because of the application of the old rating system. Since Article III prohibits federal courts from recognizing injuries that are neither "actual" nor "imminent," see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), we have no authority to reach the claim.
 
 IV. Claims of Intervenor
 
 51
 Intervenor Petroleum Marketers Association of America ("PMAA") argues that the FHWA was arbitrary and capricious in deciding to use "preventable or recordable" accidents. In its view the agency can only reasonably rely on accidents where the driver has been found to be at fault before a "fair and impartial tribunal." We need not address PMAA's arguments with respect to "preventable" accidents, since FHWA is no longer using that criterion to assign the initial safety rating. See 62 Fed.Reg. 28,826, 28,827 (1997). And we think it reasonable to use all accidents rather than just those in which the operator's driver is found at fault, in light of the uncertainty as to whether determinations of fault will be made with respect to every accident and the infirmities of the fault-determination process.
 
 
 52
 The PMAA also describes itself as an organization of small haulers which are obligated to drive under adverse conditions (e.g., to deliver heating oil in winter), and argues that FHWA did not take its industry's character into account sufficiently in formulating the rule. But the FHWA explicitly took the effect of the accident factor on small carriers into account by providing that a safety rating will not be reduced because of a single accident during each one-year period. 49 CFR 385 App. B, II.B(d), 62 Fed.Reg. 60,035, 60,044 (1997). Nor do we think the agency irrational in failing to make special accommodations for the oil delivery industry, in light of the relatively high acceptable accident rate and the existence of an appeals process in which carriers can make a case that "the recordable rate is not a fair means of evaluating its accident factor." 49 CFR 385, II. B(e), 62 Fed.Reg. at 60,044.
 
 Conclusion
 
 53
 The petitions for review and the claims of the intervenor are denied.
 
 
 54
 So ordered.
 
 
 
 [1]
 We discuss the grouping of the safety regulations into "acute" and "critical" categories in more detail at II.B., infra. The calculation of safety ratings for individual factor areas is covered at II.C., infra
 
 
 [2]
 The procedure for calculating the safety ratings in each factor area is described in II.C., infra
 
 
 [3]
 The difference between "acute" and "critical" violations is explained at II.B., supra