# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 13, 2011          Decided July 19, 2011

No. 10-5299

OCEANA, INC.,
APPELLANT

v.

GARY F. LOCKE, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00318)

*Hyland Hunt* argued the cause for appellant. On the briefs was *Sara E. Robinson*. *Eric A. Bilsky* and *Avrum M. Goldberg* entered appearances.

*Robert J. Lundman*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *John L. Smeltzer*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: SENTELLE, *Chief Judge*, GINSBURG and GARLAND, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*:  Oceana, Inc. brought this suit against the National Marine Fisheries Service challenging as unlawful the methodology it uses to track bycatch in the fisheries off the Northeastern coast of the United States.  The district court concluded the methodology satisfies applicable law, *see* 16 U.S.C. § 1853(a)(11), and entered a summary judgment for the Fisheries Service, which Oceana now appeals.  Because the Fisheries Service has merely described but has not, as the Fisheries Act requires, "established" a "standardized reporting methodology" to assess bycatch in the Northeastern fisheries, we reverse the judgment and instruct the district court to vacate the rule adopting the methodology and to remand the matter to the agency for further proceedings.

## I.  Background

The Magnuson-Stevens Fishery Conservation and Management Act, as amended by the Sustainable Fisheries Act, 16 U.S.C. §§ 1801-1884 (Fisheries Act), requires the Secretary of Commerce, through the Fisheries Service,[*] to adopt policies that "to the extent practicable," reduce the volume of bycatch, § 1851(a), that is, fish that are inadvertently or unavoidably captured by nets or other gear and then discarded, *see* § 1802(2) (defining bycatch as the "fish which are harvested in a fishery, but which are not sold or kept for personal use").  *See also* § 1801(c)(3) (stating

[*] The Fisheries Service is a branch of the National Oceanic and Atmospheric Administration (NOAA), in the Department of Commerce.  The Secretary of Commerce and the NOAA are also defendants and appellees in this lawsuit.  For simplicity we refer only to the Service.

congressional intent to "encourage[] development of practical measures that minimize bycatch and avoid unnecessary waste of fish"). The Fisheries Act further instructs the agency, in conjunction with eight regional councils, to "establish a standardized reporting methodology to assess the amount and type of bycatch" in each fishery in each region. § 1853(a)(11); *see* § 1852 (regarding role and authority of regional councils). The councils then use the reports to develop policies to minimize bycatch and bycatch mortality. *See* 50 C.F.R. § 600.350(d) (requiring regional council to create a database on bycatch and bycatch mortality that will help it "evaluate conservation and management measures").

In order to comply with the directive in § 1853(a)(11) to "establish a ... methodology," the Fisheries Service, working with the councils for the New England and Mid-Atlantic regions, proposed an "omnibus amendment" to the fishery management plans for each of the 13 fisheries in those regions, *see* 73 Fed. Reg. 4736 (Jan. 28, 2008). The Amendment requires the Service's regional officials to fund and allocate independent observers to gather data on bycatch from each "fishing mode," or combination of vessel type and fishing gear. *See id.* at 4738. The Service must fund enough observer voyages to generate statistically reliable data. *Id.* at 4738 ("The amendment is intended to ensure that the data collected ... are sufficient to produce a coefficient of variation (CV) of the discard estimate of no more than 30 percent, in order to ensure that the effectiveness of the [Amendment] can be measured, tracked, and utilized to effectively allocate the appropriate number of observer sea days").

The Amendment separately authorizes the Service to invoke a "Prioritization Process," however, "[i]n any year in which external operational constraints would prevent the [agency] from fully implementing the required at-sea observer

coverage levels." In those years the Service may, instead of complying with the levels set out in the Amendment, determine the "most appropriate" number and allocation of observers according to the "data needs" of the Service, its obligations under other statutes, and "any other criteria" it may identify. *Id.* The Amendment also commits the agency to consulting the regional councils about its proposed "prioritized allocations" before implementing them.[*] *Id.*

Oceana filed suit in the district court claiming the Amendment violates the Fisheries Act, the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332. The district court rejected all of Oceana's statutory claims, 725 F. Supp. 2d 46 (2010), as well as its "Motion to Compel Completion of the Record" with documents the Service contends are privileged, 634 F. Supp. 2d 49 (2009). Oceana appeals both rulings.

---

[*] The Amendment provides in relevant part:

> In any year in which external operational constraints would prevent NMFS from fully implementing the required at-sea observer coverage levels, the Regional Administrator and Science and Research Director will consult with the Councils to determine the most appropriate prioritization for how the available resources should be allocated. In order to facilitate this consultation, in these years [they] will provide the councils, at the earliest practicable opportunity [with four types of information] ... . The Councils may choose to accept the proposed observer coverage allocation or to recommend revisions or additional considerations ... ." 73 Fed. Reg. at 4738.

5

## II. Analysis

In its primary argument on appeal, Oceana contends the Fisheries Service has not "established" a standardized bycatch reporting methodology, as the term is used in the Fisheries Act, § 1853(a)(11). We will defer to the Service's interpretation of what that provision requires so long as it is "rational and supported by the record," *C & W Fishing Co. v. Fox*, 931 F.2d 1556, 1562, (D.C. Cir. 1994), and we will not set aside the agency's choice of a methodology unless it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see* § 1855(f) (providing for judicial review of regulations pursuant to the APA).[*] Although the district court heard this dispute in the first instance, *see* § 1861(d), on appeal we review not the judgment of the district court but the agency's action directly, giving "no particular deference" to the district court's view of the law. *Natural Res. Def. Council v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000) (quoting *Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1254 (D.C. Cir. 1999)); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2000) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law.") (internal quotation marks omitted).

Oceana argues the Amendment is not consistent with § 1853(a)(11) because, instead of establishing a methodology

---

[*] Because we apply the same standard of review to the Amendment issued by the Service and to the Secretary's approval thereof, *see Fishing Co. of Alaska v. Gutierrez*, 510 F.3d 328, 330 (D.C. Cir. 2007) (rejecting as unreasonable Secretary's determination that a procedurally defective rule proposed by the Fisheries Service was "consistent with applicable law"), we do not distinguish further between them.

by which the agency will proceed, the Amendment describes "an optional methodology" that applies "in some years and not in others." In response, the Service says it has established a methodology pegged to a benchmark of statistical precision that is binding upon it "unless external operational constraints, such as funding shortfalls" make compliance impossible; in other words, it is enough to satisfy § 1853(a)(11) that the Amendment "establishes" the methodology the agency will use when it can. Oceana, the Service adds, remains free to challenge the allocation of observers for any particular year.

The Fisheries Service rests its defense of the Amendment upon the scope of the phrase "external operational constraint," which it says is a meaningful limitation upon the agency's discretion to depart from the standardized methodology it has prescribed. To address this argument we consult our decisions addressing similar statutory mandates, in regulatory regimes other than the Fisheries Act, to "establish" (or "prescribe" or "set," or the like) a procedure or standard. *Compare, e.g.*, *Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207 (2007) (concluding EPA reasonably prescribed process by which it would impose "terms and conditions [in permits] ... necessary to protect human health and the environment," as required by Resource Conservation and Recovery Act, 49 U.S.C. § 6925, despite alleged vagueness of that standard); *with Ethyl Corp. v. EPA*, 306 F.3d 1144 (2002) (holding EPA did not sufficiently "establish methods and procedures for making tests" for new automobile models, as required by Clean Air Act, because regulation did not prescribe standard by which agency would approve an emissions test proposed by a manufacturer); and *MST Express v. Dep't of Transp.*, 108 F.3d 401 (1997) (holding Secretary of Transportation did not satisfy mandate of Motor Carrier Safety Act to "prescribe regulations establishing a procedure

to decide on the safety fitness of owners" because agency issued specific standards in informal document and left formal regulation vague).

Summarizing these cases most recently in *Cement Kiln*, 493 F.3d at 217, we considered the limits upon an agency's authority to reserve in advance some discretion to depart on a case-by-case basis from an otherwise applicable rule: The agency must adequately define the circumstances that "trigger" the case-by-case analysis, 493 F.3d at 222-23, and it must set an "identifiable standard" to guide its judgment when operating under that procedure, *id.* at 220-21 (quoting *Ethyl Corp.*, 306 F.3d at 1149-50). The agency has broad discretion to use general terms for the "trigger" and the "identifiable standard," however, unless the statute requires the agency to be more specific or the rule reflects an unreasonable interpretation of the statute. *See id.* at 217-18 (quoting *Ethyl Corp.*, 306 F.3d at 1149). As we said in *Cement Kiln*, showing a rule is "impermissibly vague" when the statute is silent is "always a difficult burden for a petitioner to overcome." *Id*. at 222-23.

The Amendment at issue here fails to survive this indulgent standard of review because it creates an exception so vague as to make the rule meaningless: The Fisheries Service apparently has given itself complete discretion to determine when an "external operational constraint prevents [it] from fully implementing the required coverage levels." 73 Fed. Reg. at 4738. As Oceana observes, nothing in the Amendment prevents the Service from announcing a "constraint" applies in any or indeed every year.

In its brief the Service tells us a "funding constraint" is the "quintessential example" of an "external operational constraint scenario." Neither that nor any other example is

instanced in the Amendment itself but let us assume for the sake of the agency's argument the term "external operational constraint" does not comprise every ill wind that blows the agency's way but instead refers exclusively to a funding constraint. We would still have to conclude the Service failed to "establish" a standardized reporting methodology. The Amendment prescribes no criterion or formula by which the Service determines whether the funding available to it in a particular year will prevent it from "fully implementing" the standardized methodology. Consequently, the agency can declare a budgetary "constraint" in any year it finds doing so convenient, with no detectable consistency from one year to another. Perhaps the only constant is that no agency ever has enough money to do everything it might want to do. Be that as it may, no reasonable interpretation of the statutory instruction to "establish a standardized methodology" would allow the agency to reserve to itself effectively complete discretion to trigger an exemption.

Nor is it clear even a "funding constraint" is necessarily "outside the agency's control," as the Service implies: The Service nowhere claims the Congress appropriates a specific amount for the observation program or prohibits the Service from using other appropriated or, for that matter, nonappropriated funds for that purpose. *See* Comments of Oceana Concerning the Northeast Region Standardized Bycatch Reporting Methodology Omnibus Amendment, Sept. 24, 2007, at 8 ("While the ... Amendment established a mechanism which would allow regional councils to establish industry-funding for observers through future rulemakings," *see* 73 Fed. Reg. at 4740, the Fisheries Service "never considered using industry funding to ensure that the [precision] standard was always achieved"). Because the agency determines both the amount of funding required for bycatch observation and the funding it will allocate for that

purpose, it can determine the stringency of this supposedly "external" constraint and thus free itself at will from the methodology it purportedly "established." This will not do.

In addition to setting an impermissibly vague "trigger," *Cement Kiln*, 493 F.3d at 223, the Amendment does little to channel the agency's exercise of discretion when it determines the "most appropriate" allocation of observers. The Amendment identifies a handful of factors upon which the agency "should" set its priorities, including the "data needs of upcoming stock assessments ... [and of] fishery management actions," and the applicable "legal mandates" of the Endangered Species Act and the Marine Mammal Protection Act. These factors, which merely restate the agency's statutory obligations, do not meaningfully constrain the agency in setting and implementing its priorities. *Compare* 73 Fed. Reg. at 4738/3, *with Cement Kiln*, 493 F.3d at 223 (holding EPA sufficiently identified standard by referencing "nine relatively specific factors").

In sum, the Service's defense of the Amendment is as unpersuasive as it is conclusory. To Oceana's argument that "key elements" of the methodology, including the standard of precision, are in fact "optional" because the agency may disregard them at will, the agency has responded, in effect, that the key elements and the methodology as a whole are binding upon it — except of course in the years when they are not. *See, e.g.*, Govt. Br. at 26 ("The methodology does not change if funding is insufficient"). The agency appears to mean the methodology is "established" in some Platonic sense, serving as the model to which the agency will aspire, though it is never itself fully realized. (Ah, but a man's reach should exceed his grasp, or what's a heaven for?) Here we must agree with Oceana: The "prioritization process" is the exception that proves this rule and shows it is not a rule at all.

Although the Service congratulates itself for having adopted an approach "particularly wise in this fiscal climate," the self-proclaimed wisdom of the approach cannot save it because the Congress, in its more commanding wisdom, has not authorized it.  Here, we take note of the second clause of subsection (a)(11), which directs the agency to adopt "conservation and management measures that [minimize bycatch and bycatch mortality] to the extent practicable."  The qualifier "to the extent practicable" does not appear in or modify the first clause of the same sentence, where the Service is directed to "establish" a standardized methodology.  When a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's duty is clear; if it believes the statute untoward in some respect, then "it should take its concerns to Congress," for "[i]n the meantime it must obey [the statute] as written." *Natural Res. Def. Council v. EPA*, No. 10-1086, slip op. at 21 (D.C. Cir. Jul. 1, 2011); *cf. Pennsylvania v. Lynn*, 501 F.2d 848, 852 (D.C. Cir. 1974) (upholding Secretary's "limited discretion" to terminate statutorily mandated housing programs he found were frustrating rather than advancing congressional intent).

## III.  Conclusion

Because the Amendment grants the Fisheries Service substantial discretion both to invoke and to make allocations according to a non-standardized procedure, we hold the Service did not "establish" a standardized methodology under the Fisheries Act.  At best the rule sets a benchmark from which the agency freely can and apparently does significantly depart in its annual allocation of observers.[*]  We therefore

---

[*] Experience thus far tends to support this conclusion: The agency is yet to apply the "standardized" methodology it purportedly "established" because it has found itself subject to a "constraint" in

reverse the judgment of the district court without reaching either Oceana's separate challenge under the NEPA, *see NRDC v. Daley*, 209 F.3d at 753, or its appeal of the order denying its motion for completion of the record, *see Ctr. for Auto Safety v. Ruckelshaus,* 747 F.2d 1, 6 (D.C. Cir. 1984); *Metcalf v. Daley*, 214 F.3d 1135, 1146 n.4 (9th Cir. 2000) (ruling that agency's Environmental Assessment violated NEPA "renders moot" challenge to denial of motion to compel production of administrative record material because "[w]ith the preparation of a new EA, a new administrative record will also be generated"). We remand this matter to that court for the purpose of vacating the Amendment and remanding it to the agency for further proceedings consistent herewith.

*So ordered.*

each of the four years the final rule has been in effect. *See* Appellant Br. at 27-28 (of the observer voyages required under standardized methodology, agency funded less than 30 percent in 2008 and roughly 40 percent in 2009). The plasticity of the Amendment being apparent on its face, however, and the 30-day deadline in § 1855(f) for seeking judicial review implying a congressional preference for immediate resolution, we see no reason to withhold judgment pending a challenge to the rule as applied. *See Cement Kiln*, 493 F.3d at 215; *accord NRDC v. EPA*, slip op. at 16.