

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00009-CV

_____

DENNIS RAYNER AND JOE TEX XPRESS, INC., Appellants

V.

KRISTA DILLON, Appellee

On Appeal from the 62nd District Court
Hopkins County, Texas
Trial Court No. CV40921

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Chief Justice Morriss
Concurring Opinion by Justice Burgess
Dissenting Opinion by Justice Moseley

# OPINION

After years of frequent errors and gaps in his required driving logs and after days and weeks of a taxing driving schedule, the extent of which is subject to some question—in large measure because of the unreliable driving logs—long-haul truck driver Dennis Rayner was driving his tractor-trailer rig east on Interstate Highway 30 through Sulphur Springs when he hit Krista Dillon's automobile from the left rear as he changed from the center lane to the right lane. After initially refusing medical care at the accident scene, Dillon went to a local emergency room that evening, complaining of head, neck, and low-back pain. Eventually, Dillon underwent an anterior cervical discectomy and fusion at C3-4 and a posterolateral fusion and foraminotomy on L2-3 for traumatic facet disruption and nerve root compression. As a result, Dillon sued Rayner and his employer, Joe Tex Xpress, Inc. (Joe Tex), for personal injury and was awarded judgment for actual damages in excess of $1 million[1] and exemplary damages in the amounts of $2,000.00 against Rayner and $1,679,259.52 against Joe Tex.[2]

This appeal centers on the jury findings of gross negligence. Rayner and Joe Tex argue that the evidence is legally and factually insufficient to support the gross-negligence findings. Because we disagree, we affirm the judgment of the trial court.

---

[1]At trial, Rayner and Joe Tex accepted full responsibility for the accident, and their appeal relates solely to the jury's determination that they were grossly negligent and to the damages resulting from that determination. The actual damages of $1,110,629.76 were paid before this appeal was filed and are not in issue here.

[2]After applying the statutory damages cap, the trial court reduced the exemplary damages that the jury assessed against Joe Tex from $3 million to $1,679,259.52. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008 (West 2015).

2

## I.     The Evidence

Rayner was hired by Joe Tex in 2007 as a long-haul truck driver, but at the time of the July 23, 2010, accident, he had over thirty years of long-haul experience. On the day of the accident, evidence suggests that Rayner left Van, Texas, at approximately 9:30 a.m. and drove to Wylie, where he unloaded his truck. After he unloaded in Wylie, Rayner drove to Dallas, where he was scheduled to pick up another load that was ultimately cancelled. Rayner was driving from Dallas to Joe Tex's headquarters in Mount Vernon when the accident occurred. As he was traveling east on Interstate 30 through Sulphur Springs[3] at approximately 1:30 p.m., Rayner changed lanes from the right-hand, or outside, lane to the left-hand, or inside, lane to pass a car that was in the outside lane. As he was returning to the outside lane, the front passenger portion of Rayner's truck struck the rear driver's side of Dillon's Chevy Malibu, causing her car to spin into the median between the service road and the interstate. Rayner stated that Dillon's car was in his "blind spot" and that he simply did not see it. Rayner received a citation for changing lanes when it was unsafe to do so.

Dillon's evidence of gross negligence included (1) proof of repeated incidents of log book falsification by Rayner, (2) a Federal Department of Transportation (DOT) audit in April 2010 that reflected forty-eight safety-related violations by Joe Tex drivers, thirty-four of which were critical, and which resulted in the lowering of Joe Tex's safety rating from "satisfactory" to "conditional" status, (3) proof that Joe Tex's safety rating at the time of the accident was "conditional," (4) proof

---

[3]The section of Interstate 30 that runs through Sulphur Springs contains four lanes, with two lanes running east and two lanes running west.

that, in the month before the accident, Rayner failed to submit thirteen driving logs required by the DOT and that this constituted thirteen violations, (5) proof that Rayner falsified his log books in the month and days preceding the accident, (6) proof that Rayner committed log-book violations on the date of the accident, (7) Rayner's admissions that he "sucked" at maintaining driving logs and that he has been "sloppy" with his log books for years, (8) proof that the federal regulations establishing maximum daily and weekly hours of service for long-distance drivers are designed to keep fatigued drivers from operating vehicles,[4] (9) proof that fatigue plays a role in most tractor-trailer, or eighteen-wheeler, accidents, and (10) the admissions by Joe Setina, the president of Joe Tex, that (a) Joe Tex was fined by the DOT for producing falsified log books, (b) Rayner was the second worst perpetrator of log book violations among the Joe Tex drivers, (c) he knew before the accident that Rayner falsified his log books, (d) Rayner and Joe Tex make money when Rayner drives his truck and then falsifies his log book to indicate that he was off duty when he was driving, (e) driving in excess of the maximum hours established by federal regulations results in fatigue, which could lead to accidents in which people are catastrophically injured, (f) the policies and procedures of Joe Tex state that a driver's employment will be terminated on commission of a fourth log book violation within thirty days of the last violation, and (g) while Rayner had committed more than four log book violations, his employment was not terminated because, according to Setina, "It's my call. It's my company. I can kind of do what I want."

---

[4]The Federal Motor Carrier Safety Administration has promulgated regulations for commercial truck drivers. *See* 49 C.F.R. § 395.3 (West, Westlaw current through July 7, 2016). These regulations generally provide that a driver is permitted to work fourteen hours per day, but can drive for only eleven of those fourteen hours. 49 C.F.R. 395.3.

## II.   The Law

Rayner and Joe Tex contend that the evidence is legally and factually insufficient to support the jury's findings of gross negligence as to each of them.  "Gross negligence" is statutorily defined as an act or omission:

> (A)   which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (B)   of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(A), (B) (West Supp. 2015).  Under the first, objective element, an "extreme risk" is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff.  *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998).

Under the subjective element, "actual awareness means that the defendant knew about the peril, but its acts or omissions demonstrated that it did not care."  *Id*.  "[A]wareness of an extreme risk does not require proof that the defendant anticipated the precise manner in which the injury would occur to identify to whom the injury would befall."  *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 139 (Tex. 2012).  Determining whether an act or omission involves peril requires "an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight."  *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23(Tex. 1994), *superseded by statute*, Act of Jun. 2, 2003, 78th Leg., R.S., ch. 204, § 13.02, 2003 Tex. Gen. Laws 847, 887, *as recognized in Waldrip*, 380 S.W.3d at 140.  Both elements of

5

gross negligence must be proven by clear and convincing evidence, *Waldrip*, 380 S.W.3d at 138, and may be proven by circumstantial evidence. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (per curiam).

In reviewing the legal sufficiency of the evidence supporting a finding that must be proven by clear and convincing evidence, we must consider "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004)); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(2) (West Supp. 2015). "To give appropriate deference to the fact[-]finder's conclusions and the role of a court conducting a legal sufficiency review," we "must assume that the fact[-]finder resolved disputed facts in favor of its finding if a reasonable fact[-]finder could do so." *Garza*, 164 S.W.3d at 627 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Conversely, we must "disregard all evidence that a reasonable fact[-]finder could have disbelieved or found to have been incredible." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). We must be careful, however, not to disregard undisputed facts that do not support the finding, as this "could skew the analysis of whether there is clear and convincing evidence." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). Should we conclude that no reasonable fact-finder could form a firm belief or conviction that both the objective and subjective elements of gross negligence were proven with respect to Rayner and Joe Tex, then we must conclude that the evidence is legally insufficient.

"The distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one in some cases, but there is a distinction in how the

6

evidence is reviewed." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In a factual sufficiency review, our inquiry is "whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations." *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). We consider "whether disputed evidence is such that a reasonable fact[-]finder could not have resolved that disputed evidence in favor of its finding." *Id.* Evidence is factually insufficient "[i]f, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction." *Id.*

## III.    Causation Is Established

The parties devote significant argument to the issue of whether Rayner's fatigue caused the accident. The sole basis of this appeal, however, involves the questions of whether the evidence is legally and factually sufficient to support the jury's findings that it was the gross negligence of Rayner and Joe Tex that resulted in Dillon's harm. To resolve these issues, we need to determine only whether there is clear and convincing evidence of both the objective and subjective components of gross negligence as defined by statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(A), (B). In order to conduct this analysis, we need not perform a sufficiency review of the evidence regarding the proximate cause of the accident. In fact, we are not even authorized, on this record, to review the sufficiency of the proximate cause evidence in this case.

The logic of this position follows. As a prerequisite to any gross negligence findings, Dillon was required to prove the basic elements of a cause of action for ordinary negligence, i.e., that Rayner and Joe Tex's breach of the ordinary standard of care proximately caused her damages.

7

*See Nowzaradan v. Ryans*, 347 S.W.3d 734, 741 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *Sonic Sys. Int'l, Inc. v. Croix*, 278 S.W.3d 377, 394–95 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (finding of ordinary negligence prerequisite to finding of gross negligence). Once the jury found that Rayner and Joe Tex were negligent, i.e., that they breached the ordinary standard of care and that such breach proximately caused damage to Dillon, the causation element was satisfied, and the jury was not required to make a new finding of causation connecting Rayner's and Joe Tex's gross negligence to Dillon's harm. *See Fort Worth Hotel, Ltd. P'ship v. Enserch Corp.*, 977 S.W.2d 746, 753 (Tex. App.—Fort Worth 1998, no pet.) (because jury was instructed that defendant was negligent and that negligence was proximate cause of damages, jury was not required to make new causation finding in order to determine defendant's gross negligence). Stated differently, once the jury determined that Rayner's and Joe Tex's ordinary negligence proximately caused damage to Dillon, the only question that remained for the jury to answer was whether that negligence was not just ordinary negligence, but was, instead, gross negligence.

This issue was addressed most recently in *Telesis/Parkwood Retirement I, Ltd. v. Anderson*, 462 S.W.3d 212, 247 (Tex. App.—El Paso 2015, no pet.). There, the appellees complained that "there was no clear and convincing evidence that was legally or factually sufficient to show Parkwood's gross negligence caused harm to [appellant]." *Id.* Our sister court initially observed that there was no requirement to show that appellees' gross negligence caused the appellant's harm, because "[w]hat lifts ordinary negligence into gross negligence is the defendant's mental attitude." *Id.* (quoting *Newman v. Tropical Visions, Inc.*, 891 S.W.2d 713, 721 (Tex. App.—San Antonio 1994, writ denied)). Because the appellate court had already determined that the

8

evidence was legally and factually sufficient to warrant the jury's verdict that the appellee's negligence caused Anderson's harm, the causation element was satisfied. *Id.* Recognizing, however, that evidence of simple negligence is "not enough to prove either the objective or subjective elements of gross negligence," the court interpreted the issue as a challenge to the sufficiency of the evidence to prove gross negligence by clear and convincing evidence (disregarding appellee's "contentions regarding the sufficiency of the evidence to support a finding of causation of 'ordinary' negligence"). *Id.*

Here, the jury was presented with a broad-form question asking whether "the negligence, if any, of those named below proximately cause[d] the occurrence in question." The jury was presented with evidence that Rayner's fatigue proximately caused the accident, and, based—at least in part—on that evidence, the jury found that both Rayner and Joe Tex were negligent. Neither party objected to the broad-form jury question on any basis, and the sufficiency of the evidence to prove ordinary negligence and proximate cause were not appealed. Joe Tex cannot now claim that Dillon failed to show that Rayner's fatigue proximately caused the accident. *See Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (trial court not required to ask jury to specify ground on which it relied to answer question in jury charge); *see also Wackenhut Corrs. Corp. v. de la Rosa*, 305 S.W.3d 594, 622 (Tex. App.—Corpus Christi 2009, no pet.) (failure to object to form of jury questions limited appellate review to whether any of plaintiff's theories were supported by sufficient evidence), *abrogated on other grounds by Zorrilla v. Aypco Const. II, LLC*, 469 S.W.3d 143, 157 (Tex. 2015); *see also Thomas v. Oldham*, 895 S.W.2d 352, 360 (Tex. 1995) (defendant who did not ask for separate damage findings could only challenge

9

sufficiency of the evidence supporting the whole verdict). Moreover, because the sufficiency of the evidence supporting the jury's finding on proximate cause was not appealed, we are precluded from reviewing that issue.

## IV. Sufficient Evidence Supports the Gross-Negligence Finding as to Rayner

Having clarified the issues, we now examine the record to determine whether sufficient evidence supports the jury's findings (1) that Rayner's acts or omissions, when viewed objectively from Rayner's standpoint at the time the act or omission occurred, involved "an extreme degree of risk, considering the probability and magnitude of the potential harm to others" and (2) that Rayner was actually, subjectively aware of the risks involved, but nevertheless proceeded in the face of that risk, showing conscious indifference to the rights, safety and welfare of others. TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(A), (B).

Rayner testified that he knew that eighteen-wheelers could cause catastrophic injuries. He further acknowledged that it is important to keep accurate log books in order to ensure against driver fatigue, and that the regulations limiting driving time to eleven hours per day and total work time to fourteen hours per day are in place to protect against driver fatigue. Rayner is aware, based on his own experience, that some eighteen-wheeler truck drivers drive while fatigued. Rayner testified that "I suck at logs, sir," and that he has been sloppy with his log books for years. When Rayner was questioned at trial about one of his many over-hour violations, he responded, "I made a mistake," but agreed that he had many other over-hour violations. Although Rayner refused to admit that most trucking accidents involve driver fatigue, Setina testified that an eighteen-wheeler driver who drives in excess of eleven hours a day is unsafe because "that's when they get in

10

accidents and that's when they catastrophically injure people." Angie Dunavant, Joe Tex's chief financial officer, testified that, if a driver continually violates company policy by improperly filling out their log books, people can and will be seriously and catastrophically injured.

Rayner contends that, despite the fact that he was careless with his log book entries, what happened in this case was an act of simple negligence—the act of changing lanes without seeing Dillon. He argues that this act of simple negligence was completely unrelated to any of his incorrect log book entries, stating that "behavior that is merely thoughtless or careless is not malicious or grossly negligent." *N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 128 (Tex. App.—Beaumont 2001, pet. denied).

Indeed, aggravating circumstances are required to transform an act of simple negligence into one of gross negligence. In *Emmons*, for example, the driver of a moving van rear-ended a Ford Bronco in which Emmons was a front-seat passenger, resulting in Emmons' paralysis. *Id*. at 112. The jury found that the driver and his employer acted with malice[5] and assessed exemplary damages against the employer. In concluding that the jury's finding of malice was not supported by legally sufficient evidence, the court noted that the van driver was not driving appreciably faster than other vehicles on the highway and that a witness noticed nothing erratic or unusual about his driving before the collision. *Id*. at 128. The court further observed that, although the van driver's failure to observe that the Bronco had stopped was careless and had tragic consequences, that behavior was "merely thoughtless or careless" and was not "malicious or grossly negligent." *Id*.

_____

[5]At the time of the accident, the statutory definition of "malice" included an alternative gross negligence component. The jury was instructed with this definition of malice. *Emmons*, 50 S.W.3d at 127. Currently, malice is defined solely as "a specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7) (West Supp. 2015).

11

Because the driver's actions did not rise to the level of extreme risk, the finding of malice against him was not supported by legally or factually sufficient evidence. *Id*. at 127. The employer was therefore not vicariously liable for the finding of malice against its driver.

Rayner contrasts *Emmons* with this Court's opinion in *USA Truck, Inc. v. West*, 189 S.W.3d 904 (Tex. App.—Texarkana 2006, pet. denied). In *West*, this Court upheld the jury's malice finding[6] against a tractor-trailer driver who, "[o]n a dark and moonless night, . . . backed a seventy-five-foot-long tractor-trailer across two lanes of traffic on a four-lane urban highway." *Id*. at 908. While the truck driver was engaged in this thirty-to-forty-second maneuver, Condor collided with the side of the trailer and was killed. *Id*. at 906. A trucking safety expert testified that Condor had the right of way and that the truck driver did not have "any business backing a trailer across his lane of travel in the dark." *Id*. at 908. In addition, there was evidence that the truck driver had driven fourteen hours without taking a break in violation of federal service hour regulations. This excessive time behind the wheel was characterized by the safety expert as "egregious," and he stated that such conduct would either result in the death of the driver or the death of another. *Id*.

Rayner believes this case is analogous to *Emmons* because the record here, he believes, contains none of the type of evidence necessary to show gross negligence, as was present in *West*. He thus concludes that the evidence fails to show that he posed an extreme risk of serious injury to other drivers on the accident date or that he knew about the peril, but nevertheless proceeded

---

[6]As in *Emmons*, the definition of "malice" in *West* is currently the statutory definition of "gross negligence." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (West Supp. 2015).

with conscious indifference to the rights, safety, or welfare of others. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11).

Dillon sees this evidence as proving that a fatigued tractor-trailer driver poses an extreme risk of serious injury to other drivers and that Rayner knew that driving in his fatigued condition posed this risk, but he chose to drive in such a state knowing of the risk he posed to other drivers. Dillon points to the evidence previously outlined: (1) just three months before the accident, Rayner was cited for nine DOT violations for driving excessive hours,[7] (2) Rayner had thirteen missing

---

[7]The April 2010 DOT audit of Joe Tex reflects that Rayner was cited with six critical violations and three nominal violations of DOT regulations. The critical violations reflect that:

- On or about 02/04/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial motor vehicle in interstate commerce from Blytheville, AR to Conway, AR. The driver made a false report of duty activities on the record of duty status for that date. The driver's record of duty status is false because on 02/04/2010 Comdata fuel report shows driver Dennis Rayner fueling in Calera, OK at 7:07 PM (CT). On 02/04/2010 log book shows driver Dennis Rayner shows arriving in Cleburne, TX at 7:30 PM (CT) and going off duty between 7:30 PM (CT) and midnight. As per PC miler, Cleburne, TX to Calera, OK is approximately 138 miles and 2 hours and 25 minutes from each other.

- On or about 02/05/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial motor vehicle in interstate commerce from Cleburne, TX to Fourchon, LA. The driver made a false report of duty activities on the record of duty status for that date. The driver's record of duty status is false because on 02/05/2010 Comdata fuel report shows driver Dennis Rayner fueling in Vinton, LA at 9:45 PM (CT). On 02/05/2010 log book shows driver Dennis Rayner shows off duty all day in Cleburne, TX. As per PC miler, Vinton, LA to Cleburne, TX is approximately 395 miles and 6 hours and 4 minutes from each other.

- On or about 02/09/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial motor vehicle in interstate commerce from Tylertown, MS to Houston, TX. The driver made a false report of duty activities on the record of duty status for that date. The driver's record of duty status is false because on 02/09/2010 Comdata fuel report shows driver Dennis Rayner fueling in Van, TX at 5:57 PM (CT). On 02/09/2010 log book shows driver Dennis Rayner driving from Pauls Valley, OK and Perry, OK between 5:30 PM (CT) and 7:00 PM (CT). As per PC miler, Pauls Valley, OK to Van, TX is approximately 236 miles and 3 hours and 30 minutes from each other. As per PC miler, Perry, OK to Van, TX is approximately 351 miles and 5 hours from each other.

13

log book entries the month before the accident, (3) Rayner's log book entry of July 21 reflected that he drove to Mobile, Alabama, but the bill of lading for the shipment he transported on that date showed that he was in Sherman, Texas, and (4) Rayner's log books both on the day before and on the day of the accident were inaccurate. Additionally, Dillon highlights Rayner's admission that accurate log books are necessary to determine whether a driver is fatigued and that his log books were wrong regarding the day before the accident.[8] He therefore could not tell the jury that he was not fatigued on the day of the accident.

---

- On or about 02/11/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial motor vehicle in interstate commerce from Kimball, NE to Sherman, TX. The driver made a false report of duty activities on the record of duty status for that date. The driver's record of duty status is false because on 02/11/2010 Comdata fuel report shows driver Dennis Rayner fueling in North Platte, NE at 1:49 PM (CT). On 02/11/2010 log book shows driver Dennis Rayner going off duty in Aurora, NE between 2:00 PM (CT) and 3:00 PM (CT). As per PC miler, North Platte, NE to Aurora, NE is approximately 159 miles and 2 hours and 13 minutes from each other.

- On or about 02/26/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial motor vehicle in interstate commerce from Blanco, NM to Ingleside, TX. The driver made a false report of duty activities on the record of duty status for that date. The driver's record of duty status is false because on 02/26/2010 Comdata fuel report shows driver Dennis Rayner fueling in Moriarty, NM at 6:04 PM (CT). On 02/26/2010 log book shows driver Dennis Rayner off duty in Corpus Christi, TX between 6:30 PM (CT) and midnight. As per PC miler, Corpus Christi, TX to Moriarty, NM is approximately 833 miles and 13 hours and 58 minutes from each other.

- On or about 02/28/2010, Joe Tex Xpress Inc used driver, Dennis Rayner, to drive a commercial motor vehicle in interstate commerce from Blanco, NM to Ingleside, TX. The driver made a false report of duty activities on the record of duty status for that date. The driver's record of duty status is false because on 02/28/2010 Comdata fuel report shows driver Dennis Rayner fueling in San Antonio, TX at 7:18 AM (CT). On 02/28/2010 log books shows driver Dennis Rayner off duty all day in Corpus Christi, TX. As per PC miler, Corpus Christi, TX to San Antonio, TX is approximately 145 miles and 2 hours and 8 minutes from each other.

[8]This was not a big time discrepancy. The weight ticket for that date indicated that his truck was loaded at 9:19 a.m., yet the log book showed that Rayner was off duty at 9:22 a.m.

14

Setina admitted that driving in excess of the maximum hours established by federal regulations results in fatigue, which could lead to accidents in which people are catastrophically injured. Rayner's fatigued driving of an eighteen-wheeler was more than an act of simple carelessness. This evidence establishes that Rayner's fatigued driving posed an extreme risk or likelihood of serious injury to other drivers, including Dillon. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(A).

We turn to the issue of whether Rayner was aware of the risk that his fatigued driving posed an extreme risk of serious injury to other drivers, but nevertheless proceeded in the face of that risk, with conscious indifference to the rights, safety, and welfare of others. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(B).

Rayner admitted that accurate log books are necessary to determine whether a driver is fatigued, and he could not say that he was not fatigued on the day of the accident. The evidence is undisputed that Rayner did not see Dillon's car before the accident and that he hit her car from behind. Finally, the log book violations reflecting Rayner's pattern of driving excessive hours, in conjunction with his many years' of driving experience, is circumstantial evidence that Rayner knew he was fatigued when driving excess hours and that, in doing so, he was risking the lives of others on the road. This evidence, coupled with Rayner's credibility issues, could lead a reasonable jury to form a firm conviction or belief that Rayner knew he was fatigued when driving over hours, and that, in doing so, he was risking the lives of others on the road.

As fact-finders, the jury members were permitted to weigh the evidence and to accept or reject it as they thought proper. *See Elbar, Inc. v. Claussen*, 774 S.W.2d 45, 50 (Tex. App.—

15

Dallas 1989, writ dism'd) (sufficient evidence to support conclusion that truck driver was fatigued at time of accident, even though in compliance with DOT regulations). Here, the jury had sufficient evidence on which to form a firm belief or conviction that Rayner was grossly negligent. This Court is not permitted to substitute our judgment for that of the jury, and to do so would place this Court in the untenable position of sitting as a thirteenth juror.

**V.     Sufficient Evidence Supports the Gross-Negligence Finding as to Joe Tex**

In its charge to the jury, the trial court defined "negligence" to mean

the failure to use ordinary care, that is, failing to do that which a person or company of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. As to Joe Tex Xpress, Inc., "negligence" may also mean entrusting a vehicle to an unlicensed, incompetent and/or reckless driver if Joe Tex Xpress, Inc. knew or should have known that the driver was unlicensed or incompetent or reckless.

The jury found, by clear and convincing evidence, that gross negligence attributable to Joe Tex resulted in the harm to Dillon.[9] We have already determined that Setina's admission that driving in excess of the maximum hours established by federal regulations results in fatigue, which could lead to accidents in which people are catastrophically injured, is sufficient to establish the objective prong of gross negligence. Stated differently, this evidence establishes that Rayner's fatigued driving posed an extreme risk or likelihood of serious injury to other drivers, including Dillon. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(A). We now examine the evidence to determine whether it is sufficient to support the second prong of gross negligence, i.e., whether Joe Tex knew of an extreme risk of impending harm from allowing Rayner to continue to drive in the face of his

_____

[9]Both "clear and convincing evidence" and "gross negligence" were appropriately defined.

16

repeated over-hour violations, but continued to do so in conscious disregard of the safety of those who might be affected. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(B).

Setina testified at length about the April 2010 DOT audit, which resulted in a conditional safety rating for Joe Tex,[10] due in part to the critical violations attributed to Rayner. That rating was in effect at the time of the accident. The audit basically reflected the fact that Joe Tex was "fixing the books and falsifying the records," and it was fined "thousands of dollars" for doing so. Of the forty-eight violations reflected in the audit, thirty-four were critical and fourteen were nominal. Rayner should have been written up by Joe Tex as a result of the critical violations attributed to him, but he was not. Setina acknowledged that drivers who exceed the eleven-hour driving time limit are unsafe driving an eighteen-wheeler, and Setina knew Rayner exceeded that limit on several occasions, as reflected on the audit. Per the audit, Rayner was the second-worse perpetrator of log book violations, and although some of the "bad offenders" were terminated after the audit, Rayner was not. Setina knew that Rayner was still not turning in all of his logs, even after Joe Tex advised the DOT that it was implementing a new log book audit system on July 1, 2010. Setina also knew that Rayner falsified many log books before the accident.

The Joe Tex log-violations policy called for an oral warning for a first violation, retraining for a second violation within thirty days of the last contact with the driver, and a final warning and counseling on a third violation within thirty days of the last contact with the driver. A fourth violation within thirty days of the last contact with the driver required automatic termination. In a form letter sent to each driver committing log-book violations, the driver was told whether the

---

[10]A trucking company can be rated as satisfactory, conditional, or unsatisfactory by the DOT.

warning was a first, second, or third and final warning. When asked if the third and final warning meant termination, Setina testified, "It's my call. It's my company. I can kind of do what I want." Setina further testified that he decided whether to follow Joe Tex company policy, stating, "I can choose to overrule things," and "I can make the policy as I go, and I can change it." Despite Joe Tex's policy to document disciplinary actions, there was no documentation that Rayner had ever been disciplined.

The Joe Tex safety program was designed to ensure that the company does not have fatigued drivers. Yet, Joe Tex failed to document that its drivers—including Rayner—received adequate safety training. Dunavant testified that, even though the company worked with Rayner regarding his log book violations after the DOT audit, she never felt sure that he was filling out his log books correctly. It is important to log accurately so that the company can total the hours at the end of each week. If log books are inaccurate, there can never be an accurate recording of how many hours are driven each week. If a driver continually violates company policies in an eighteen-wheeler because they are not filling out their log books correctly, people can and will be seriously and catastrophically injured. The most important reason to maintain hours within regulations is to prevent driver fatigue. Craig Skidmore, who did some safety training for Joe Tex in 2009, testified that fatigue plays a role in most accidents. Rayner was involved in two accidents before the audit.

In an open letter addressing improvement in their safety rating after the audit, Joe Tex wrote, "We also have made the tough, but necessary decision to lay-off some of our long-time drivers who were responsible for many of the violations and scoring issues we were encountering."

18

But, although Rayner was responsible for almost nineteen percent of the violations noted on the audit, he was not laid off.

Some twenty years ago, this Court was faced with a fact situation similar to this case. *See Dalworth Trucking Co. v. Bulen*, 924 S.W.2d 728, 732 (Tex. App.—Texarkana 1996, no writ). In *Bulen*, this Court addressed the issue of whether the evidence supported a jury verdict that Dalworth was grossly negligent in connection with a fatal accident involving one of its employee drivers. *Id*. at 731–34. The driver ran a stop sign, killing the occupant of another vehicle. This Court upheld the verdict as supported by the evidence, although, admittedly, *Bulen* preceded the advent of the clear-and-convincing-evidence standard of review in assessing evidentiary sufficiency in gross negligence cases.[11] *Id*. at 734.

There was proof in *Bulen* that, from July to October 1994, when the accident happened, the driver had committed fifty-five violations of company speed policies, six hours violations, and one missing log violation. *Id*. at 732. Federal regulations restricted driving hours to not more than seventy hours in eight days. Five of the hours violations occurred within the week preceding the accident. *Id*. The driver failed to log pre-trip and post-trip inspections, and he was driving more hours than he was logging, which allowed the company to bill the customer for more miles and allowed drivers to be paid for more miles than company time and speed policies allowed. *Id*. Testimony showed that, although company policy provided that a driver would be discharged after accumulating three safety violations, the driver in that case was not terminated, disciplined, or admonished, and the company did not send him cautionary letters concerning his violations. *Id*.

---

[11]The verdict against Dalworth was upheld despite the jury's finding that the driver was not grossly negligent.

19

Although Dalworth was aware of many technical safety violations by its driver, none but the excessive driving hours caused or contributed to the wreck. *Id*. at 733.

The company safety manager testified that company managers were aware of the driver's over-hour violations, that over-hour driving caused driver fatigue, that fatigue from excessive driving builds up to an almost inevitable loss of alertness in a driver, and that he would give the driver's overall driving record a grade of "F" as far as safety violations were concerned. The driver had over-hour driving violations on each of the four days preceding the wreck. The evidence also showed that repeated safety violations by drivers create an extremely dangerous situation, that company managers knew about the situation but did not suspend, terminate, or admonish the driver, and that to do anything less than that would be inexcusable. The safety manager testified that he knew an accident was almost inevitable if management failed to enforce safety practices vigorously. *Id*. at 733.

As in this case, Bulen did not exceed permissible driving hours on the day of the accident. However, on the four days preceding the accident, Bulen violated the hours regulations for each of those days. Even so, the evidence showed that Bulen was not fatigued on the accident date, that he had a good night's sleep before the day of the accident, and that he had several rest breaks on the accident date. *Id*.

Based on this evidence, this Court concluded that the jury could have reasonably found that the driver's cumulative safety violations caused a lack of alertness that contributed to his failure to see the stop sign in time to stop and avoid the collision. This Court further concluded

that company managers could have reasonably foreseen a similar consequence from their failure to suspend or discipline the driver. *Id*. at 734.

As in *Bulen*, the evidence here shows that Rayner committed numerous log violations, including hours violations that tend to cause fatigue. Here, Rayner's log book indicates that, two days before the accident, he drove from Dallas to Mobile, but the bill of lading showed that he delivered a load to Sherman on that date. The trip from Dallas to Mobile, as reflected in the log book, shows exactly eleven hours of driving time. Sometime during that same day, Rayner presumably sidetracked to Sherman. There is no testimony indicating how many excess hours Rayner drove July 21.

We conclude that such evidence was sufficient to permit the jury to form a firm belief or conviction that Joe Tex was aware of the extreme risk of serious injury Rayner's fatigued driving posed to others on the road, yet continued to not only permit, but to tacitly encourage, Rayner to drive in such a state. Setina conceded that Rayner had a long history of over-hour violations and that he was aware of those violations well before the accident involving Dillon. Setina also knew that an eighteen-wheeler driver who exceeds driving hours is unsafe, because catastrophic injury can occur. From this testimony, it is apparent that Setina was aware of the fact that Rayner's driving, by definition, was unsafe every time he exceeded the eleven-hour driving limit. Although company policy required that Rayner's employment be terminated for his repeated over-hour driving violations, no adverse action was ever taken against him. Instead, Setina callously ignored Rayner's over-hour violations, stating, "It's my company. I can kind of do what I want." Moreover, Joe Tex failed to document that it did anything meaningful about Rayner's patterns,

21

including providing Rayner adequate safety training. Even after the accident, Joe Tex could not be sure that Rayner was filling out his log books correctly.

This evidence is sufficient to support the jury finding that Joe Tex knew of an extreme risk of impending harm from allowing Rayner to continue to drive in the face of his repeated over-hours violations, with no discipline or admonishment, but continued to do so in conscious disregard of the safety of those who might be affected.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice


CONCURRING OPINION

I join the majority opinion and write separately to respectfully address one point raised by the dissent. The dissent does not question the sufficiency of the evidence establishing the objective element of gross negligence as to both Dennis Rayner and Joe Tex Xpress, Inc. (Joe Tex), and the majority thoroughly addresses the sufficiency of the evidence establishing the subjective element of gross negligence as to Rayner. Therefore, my response is limited to the dissent's position that the subjective element of gross negligence was not established by clear and convincing evidence as to Joe Tex. In order to understand why I believe the evidence is sufficient as to that issue, it is necessary to briefly review the unique fashion in which this case was tried.

22

## A. Procedural History

At trial, Krista Dillon presented the evidence of log book violations and excessive driving detailed by the majority to prove that Rayner and Joe Tex were grossly negligent because Rayner was fatigued on the occasion in question and because Joe Tex allowed him to drive in that condition.[12]  Although Dillon only alleged fatigue as a separate act of gross negligence and not as an act of ordinary negligence, both theories of negligence and gross negligence were tried together and all of the evidence was presented to the jury without limitation.  Neither Rayner nor Joe Tex requested a limiting instruction when evidence of Rayner's fatigue was presented to the jury nor did they object to any variance between the pleadings and proof.[13]  Therefore, the evidence Dillon presented on the issue of gross negligence was also considered by the jury on the question of ordinary negligence and proximate cause.[14]

After the close of the evidence, the trial court submitted question 1, a broad-form question combining ordinary negligence and proximate cause.  The jury answered yes to that question as to both Rayner and Joe Tex.  After trial, both Rayner and Joe Tex accepted and paid the underlying

---

[12]The majority opinion lists the evidence Dillon presented on the issue of gross negligence.  *See* majority opinion *supra* Part I.

[13]*See Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 924 (Tex. 1981) (holding that variance between pleadings and proof "is a pleading problem, one that is handled by objections to the evidence and one which requires distinct objections to the charge which specifically advise the court of each variance") (citing TEX. R. CIV. P. 274).

[14]*See Scotchcraft Bldg. Materials, Inc. v. Parker*, 618 S.W.2d 835, 837 (Tex. Civ. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) ("It is the duty of the party objecting to the introduction of evidence which is admissible for one purpose but not for another, to request the court to limit the purpose for which it might be considered, and failing to do so, he may not be heard to complain that the jury may have considered the evidence for other purposes."); *Aluminum Co. of Am. v. Alm*, 785 S.W.2d 137, 139 (Tex. 1990) ("[S]ince Alm did not request a limiting instruction, admission of the evidence was, for all practical purposes, a general offer.  Therefore, the jury was afforded the opportunity to consider the evidence of Alcoa's warnings to Seven-Up in its deliberation on ordinary negligence." (citations omitted)).

23

judgment and only challenged on appeal the gross negligence finding and the award of exemplary damages.

Because the trial court submitted the ordinary negligence and proximate cause issues in a single, broad-form question, the jury's answer to the ordinary negligence question constitutes a finding of all the specific acts of negligence for which evidence was presented against Rayner and Joe Tex. Because the evidence regarding excessive driving and log book violations was presented without limitation and because the jury could consider that evidence in deciding whether Rayner and Joe Tex were negligent, the jury's finding of ordinary negligence necessarily includes a finding that Rayner was fatigued and that his fatigued driving was a proximate cause of the accident in this case.[15] By not asserting that the evidence was insufficient to support the jury's ordinary negligence and proximate cause findings on appeal, Rayner and Joe Tex have waived any argument that the evidence was insufficient to prove that Rayner was fatigued on the occasion in

---

[15]Because fatigued driving is neither a separate theory of liability nor a separate element of a theory of liability, but is simply an act Dillon alleged to establish the failure to use ordinary care element of a negligence claim, Dillon was not required to seek a separate question to establish that Rayner was fatigued and that his fatigued driving proximately caused the accident in question. When a plaintiff presents evidence that the defendant committed several negligent acts which proximately caused her injuries, but only alleges one theory of liability—negligence—the trial court is not required to charge the jury with a separate question as to each negligent act. *See Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 858–59 (Tex. App.—Fort Worth 2003, pet. denied) (holding that no error was shown by trial court's broad-form submission of negligence question even though plaintiff alleged several acts of negligence by each defendant, noting that "these acts are not separate theories of liability and do not constitute the assertion by [plaintiff] of any additional basis for recovery"). And when a party fails to "challenge in the court of appeals the factual or legal sufficiency of the evidence supporting" the jury's answer, the answer is established as to the theory alleged. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (holding that evidence supporting termination of appellant's parental rights under Section 161.001(b)(1)(Q) of the Texas Family Code was sufficient in absence of challenge to "factual or legal sufficiency of evidence supporting subsection Q."); *see also Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 242 (Tex. 2008) ("This is a medical malpractice case. In this appeal, it is undisputed that the hospital caused Bob Hogue's death. The jury made that finding at trial, the hospital does not challenge it in this Court, and the dissenting justices acknowledge that the evidence supports that finding.").

question and that Rayner's negligence was a proximate cause of the accident.[16]  Therefore, on this record, we are bound by the jury's findings on those allegations.[17]

## B.     The Evidence Is Sufficient to Support the Subjective Element of Gross Negligence as to Joe Tex

The dissent correctly points out that no one (including the two investigating police officers) testified that Rayner appeared at the time to be fatigued and that Rayner himself denied being fatigued at the time of the accident.  The dissent then concludes that, in the absence of such evidence, Dillon has failed to prove by clear and convincing evidence that Rayner or Joe Tex knew that Rayner was fatigued on the day of the accident.  However, in considering whether sufficient evidence establishes the subjective element as to Joe Tex, it is important to note that Dillon alleged grossly negligent entrustment against Joe Tex in addition to gross negligence.  Negligent entrustment requires "a showing of (1) entrustment of a vehicle by the owner; (2) to an unlicensed, incompetent, or reckless driver; (3) that the owner knew or should have known to be unlicensed[, incompetent, or reckless]; (4) that the driver was negligent on the occasion in question[;] and (5)

---

[16]*See Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Tex, Inc.*:

> Appellants have not raised any points of error attacking the sufficiency of the evidence supporting the jury's findings that they participated in a conspiracy to interfere with the business of the clinics or that they and their operatives tortiously interfered with the clinic's business. By failing to allege error in a point of error, any complaint as to these findings has been waived.

*Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Texas, Inc.*, 937 S.W.2d 60, 67 n.1 (Tex. App.—Houston [14th Dist.] 1996), *aff'd as modified*, 975 S.W.2d 546 (Tex. 1998) (citing *San Jacinto River Auth. v. Duke*, 783 S.W.2d 209, 210 (Tex.1990) (per curiam)).

[17]Because the evidence of log-book violations and excessive driving was presented to the jury without limitation and because Rayner and Joe Tex did not challenge the sufficiency of that evidence to support the jury's subsequent ordinary negligence and proximate cause findings, we cannot at this point consider whether that type of evidence is sufficient to establish that Rayner was fatigued and that his fatigued driving proximately caused the accident. Rather, we must begin our analysis of the gross negligence findings by assuming that the evidence was sufficient to establish those facts.

that the driver's negligence proximately caused the accident." *Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987). "Punitive damages can be imposed if the owner of the vehicle knows or should have known that the entrusted driver was incompetent or habitually reckless and the owner was grossly negligent in entrusting the vehicle to that driver." *Id*. Finally, "[f]or entrustment to be a proximate cause, the defendant entrustor should be shown to be reasonably able to anticipate that an injury would result as a natural and probable consequence of the entrustment." *Id*.

Therefore, Dillon did not have to prove by clear and convincing evidence that Joe Tex subjectively knew that Rayner was fatigued on the day of the accident. Instead, because the jury's unchallenged answer to question 1 established that Rayner was fatigued and that his fatigue proximately caused the accident, Dillon only had to prove by clear and convincing evidence that Joe Tex subjectively knew that Rayner was an "incompetent or habitually reckless" driver based on his history of fatigued driving and that it was "able to anticipate that an injury would result as a natural and probable consequence of the entrustment." *Id.*

The Department of Transportation (DOT) adopted the log book and driving limit regulations precisely because of the inherent difficulty in establishing driver fatigue as weighed against the potential danger to the public by fatigued drivers.[18] The clear purpose behind these

---

[18]In *United States v. Sandhu*, 462 F.Supp.2d 663 (E.D. Pa. 2006), the Federal District Court for the Eastern District of Pennsylvania observed,

> In a case regarding the DOT's rule for motor carriers' safety fitness ratings, the D.C. Circuit approvingly cited several studies finding that fatigue plays a significant role in truck drivers' accidents. Looking at the record in the case, the court noted that one study found that fatigue was the "'probable primary cause' of 41% of studied accidents"; a second study found an "over-risk of involvement in accidents beyond ten and more hours of work span"; and a third study concluded

regulations is to ensure that tractor-trailer drivers are not placing the public at risk of death or serious injury on the nation's highways by driving while fatigued.[19]  Rayner and Joe Tex both acknowledged that they knew the purposes behind the requirements as well as the risks associated with fatigued driving.  Yet, notwithstanding this knowledge, Rayner chronically and flagrantly violated those regulations, and Joe Tex knew it.

Therefore, even under the clear and convincing evidence standard, given the substantial history of Rayner's log book violations and driving in excess of the federal driving limits presented in this case, as well as the jury's unchallenged findings that Rayner's fatigued driving proximately caused the accident, the jury could fairly infer that Joe Tex was subjectively aware of the risk that Rayner was an "incompetent or habitually reckless" driver based on his history of excessive driving and that Joe Tex was "able to anticipate that an injury would result as a natural and probable consequence of the entrustment," but it "nevertheless proceed[ed] with conscious indifference to the rights, safety, or welfare of others."  TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (West

---

that "accident rates for trucks tend to increase dramatically the longer the driver continues beyond 8 hours of continuous driving."

*Id.* at 673–74 (citations omitted) (quoting *Am. Trucking Ass'ns v. U.S. Dep't of Transp.*, 166 F.3d 374, 384–85 (D.C. Cir. 1999) (internal quotation marks omitted)).

[19]The court in *Sandhu* went on to discuss the legislative history behind the federal regulations, noting,

The 10-hour rule [now 11-hour] on the other hand, has a different purpose: promoting safety. Though the hours of service regulations have a somewhat tortured history, the intent of Congress and the DOT is clear: limiting the hours CMV drivers can drive (and requiring them to submit logbooks verifying their hours) improves the safety of our nation's roadways.  Circumventing the regulation means risking the safety of innocent motorists.

*Id.* at 672.

Supp. 2015); *Schneider*, 744 S.W.2d at 596. Consequently, Dillon presented legally and factually sufficient evidence to establish grossly negligent entrustment against Joe Tex.

**C.     Conclusion**

Of course, it is not possible to draw a bright-line at the point where log-book violations become sufficient evidence to support a grossly negligent entrustment finding. Considering the competing interests, it seems clear that the point where the history of log-book violations rises to the level of clear and convincing evidence to support a grossly negligent entrustment finding is very high. But here, we have evidence (1) that Rayner had a substantial history of driving in excess of the federal driving limits, (2) that Joe Tex knew that history and, therefore, knew that Rayner was at risk of driving while fatigued, (3) that Joe Tex was "able to anticipate that an injury would result as a natural and probable consequence of the entrustment," and (4) that, despite that knowledge, Joe Tex made the conscious decision to violate its own work place rules and put Rayner back on the road because, in the words of Joe Tex's owner, "It's my call. It's my company. I can kind of do what I want."

Therefore, the evidence was legally and factually sufficient to support the gross negligence findings and punitive damages awards against Joe Tex.

Ralph K. Burgess
Justice

28

DISSENTING OPINION

The opinion put forth by the majority is persuasive, knowledgeable, and well-written. However, the entire matter here revolves around employment of the "clear and convincing" evidence standard necessarily employed in a finding of gross negligence. It must be remembered that Texas law requires a finding of "clear and convincing" evidence before a finding of gross negligence can be sustained. TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(A), (B) (West Supp. 2015).

Because the majority has done a masterful job of setting out the facts of the case, a restatement of those facts is unnecessary. The majority opinion also lays out the proven facts upon which they maintain that a jury was justified in finding that there was clear and convincing evidence of the existence of gross negligence. Capsuled, the evidence presented to the jury included that (1) Dennis Rayner apparently regularly falsified his federally-mandated log books, (2) Rayner often failed to submit required driving logs, (3) he had actually filled out a log book ahead of time for the date of the accident, and (4) Rayner was the worst offender among all Joe Tex Xpress, Inc. (Joe Tex) drivers of the offense of keeping accurate logbooks. Krista Dillon also proved (1) that Joe Setina, president of Joe Tex, was well aware of Rayner's shortcomings and (2) that Rayner had previously on occasion driven more than the maximum hours prescribed by federal regulation. Joe Tex was also shown to (3) have knowledge that fatigue in drivers presents a danger of collisions in which people are catastrophically injured and (4) that it had stated policies in place regarding the maintenance of log books that, if followed, would have caused Rayner to

29

lose his job with Joe Tex (but had chosen to override its own policy and not terminate him). Without a doubt, all of these things were proven by clear and convincing evidence.

However, the clear and convincing proof of those things does not almost inevitably lead to the conclusion that either Rayner or Joe Tex knew that Rayner was fatigued at the time of the collision with Dillon. In order to make that finding, the jury had to leap from the proven facts to conclude that Rayner was known to be fatigued and that he or Joe Tex were aware of that condition. No one (for instance, neither Dillon nor the investigating police officers) testified that Rayner appeared at that time to be fatigued, and Rayner testified that he was not tired.

In a concurring opinion, Justice Harriett O'Neill correctly noted the task of an appellate court when reviewing a case requiring this heightened standard of proof.

> When the burden of proof is heightened beyond a mere preponderance of the evidence—for example, when a fact must be proved either by clear and convincing evidence or beyond a reasonable doubt—then the standard for legally sufficient evidence will be correspondingly heightened. When clear and convincing evidence is required, we have held that the party with the burden of proof must introduce enough evidence "that a fact-finder could reasonably form a firm belief or conviction about the truth of the matter."

*Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 631 (Tex. 2004) (citations omitted) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (O'Neill, J., concurring)).

An example of what might be the difference here is illustrated in the realm of libel. In order to protect the First Amendment Constitutional rights, the United States Supreme Court has instituted a "clear and convincing" burden of proof in cases of defamation. In so doing, the burden is put upon judges, "as expositors of the Constitution, [to] independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any

30

judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984). Here, the burden is on us, as the reviewers of the record, to distinguish between what was established by clear and convincing evidence and what was not proven to that standard.

Precisely, then, what kind of proof is required to sustain a finding of "clear and convincing?" "[I]n reviewing the legal sufficiency of evidence to support a finding that must be proved by clear and convincing evidence, an appellate court must 'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *Garza*, 164 S.W.3d at 609 (quoting *J.F.C.*, 96 S.W.3d 266).

Although the evidence is sufficient to prove the first prong of gross negligence (that driving an eighteen-wheeler while fatigued involves an extreme degree of risk of serious harm to other drivers) there must likewise be sufficient evidence that Rayner was actually aware of this risk, and nonetheless chose to drive in a fatigued state. This evidence shows that Rayner quite often drove his eighteen-wheeler in excess of the allowable hours, but there is nothing here to support a "clear and convincing" finding that Rayner was aware of his fatigue on the accident date and that he nonetheless chose to imperil the lives of others by driving while fatigued. The gross negligence finding against Rayner cannot stand.

In its charge to the jury, the trial court defined "negligence" to mean

the failure to use ordinary care, that is, failing to do that which a person or company of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. As to Joe Tex Xpress, Inc., "negligence" may also

31

> mean entrusting a vehicle to an unlicensed, incompetent and/or reckless driver if Joe Tex Xpress, Inc.[,] knew or should have known that the driver was unlicensed or incompetent or reckless.

The jury found, by clear and convincing evidence, that the harm to Dillon resulted from gross negligence attributable to Joe Tex.[20] Setina admitted that driving in excess of the maximum hours established by federal regulations results in fatigue, a physical condition which could lead to accidents in which people are catastrophically injured. That is sufficient to establish the objective prong of gross negligence. Stated differently, this evidence establishes that Rayner's fatigued driving posed an extreme risk or likelihood of serious injury to other drivers, including Dillon. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(A). One must then examine the evidence to determine whether it is sufficient to support the second prong of gross negligence (i.e., whether Joe Tex knew of an extreme risk of impending harm from allowing Rayner to continue to drive in the face of his repeated over-hours violations, but continued to do so in conscious disregard of the safety of those who might be affected). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(B).

Setina testified at length about the April 2010 Federal Department of Transportation (DOT) audit, which resulted in a conditional safety rating for Joe Tex,[21] due in part to Rayner's multiple violations. That rating was in effect at the time of the accident. The audit basically reflected that Joe Tex was "fixing the books" and "falsifying the records," and it was fined "thousands of dollars" for doing so. Of the forty-eight violations reflected in the audit, thirty-four were critical and fourteen were nominal. Although Rayner should have been written up by Joe

---

[20]Both "clear and convincing evidence" and "gross negligence" were appropriately defined.

[21]A trucking company can be rated as satisfactory, conditional, or unsatisfactory by the DOT.

Tex as a result of the critical violations attributed to him, he was not. Setina acknowledged that when a driver exceeded the eleven-hour driving time limit, they are unsafe driving an eighteen-wheeler, and he knew Rayner exceed that limit on several occasions. Per the audit, Rayner was the second-worst perpetrator of log book violations, and although some of the "bad offenders" were terminated after the audit, Rayner was not. Setina knew that Rayner was still not turning in all of his log books, even after Joe Tex advised the DOT that it was implementing a new log book audit system on July 1, 2010. Setina also knew that Rayner often falsified log books prior to the accident.

The Joe Tex log violations program provides for a verbal warning for a first violation, retraining for a second violation within thirty days of the last contact with the driver, and a final warning and counseling on a third violation within thirty days of the last contact with the driver. A fourth violation within thirty days of the last contact with the driver requires automatic termination. In a form letter sent to drivers who are found to commit log-book violations, the driver is told whether the warning is a first, second, or third and final warning. When asked if the third and final warning meant termination, Setina testified that as president of the company, "It's my call. It's my company. I can kind of do what I want." Setina further testified that he can decide whether to follow Joe Tex company policy, stating "I can choose to overrule things," and "I can make the policy as I go, and I can change it." Despite Joe Tex's policy to document disciplinary actions, there is no documentation that Rayner had ever been disciplined.

The Joe Tex safety program was designed to ensure that they do not have fatigued drivers. Yet, Joe Tex failed to document that any of its drivers received adequate safety training. One of

the company officials testified that even though the company worked with Rayner regarding his log book violations after the DOT audit, she never felt sure that he was filling his log books out correctly. It is important to accurately post logs so that the company can total the hours at the end of each week. If log books are inaccurate, there can never be an accurate recording of how many hours are driven each week. If a driver continually violates company policies in an eighteen-wheeler because they are not filling out their log books correctly, people can be seriously and catastrophically injured. The most important reason to maintain hours within regulations is to prevent driver fatigue.

In an open letter addressing improvement in their safety rating after the audit, Joe Tex wrote, "We also have made the tough, but necessary decision to lay-off some of our long-time drivers who were responsible for many of the violations and scoring issues we were encountering." Even though Rayner was responsible for almost nineteen percent of the violations noted on the audit, he was not terminated.

*Dalworth Trucking Co. v. Bulen*, 924 S.W.2d 728 (Tex. App.—Texarkana 1996, no writ), involved a fact situation similar to this case. In that case, this Court addressed the issue of whether the evidence supported a jury verdict that Dalworth was grossly negligent in connection with a fatal accident involving one of its employee drivers. *Id*. at 731–34. The driver ran a stop sign, killing the occupant of another vehicle. This Court upheld the verdict as supported by the evidence, although *Bulen* preceded the advent of the clear and convincing standard review of evidentiary sufficiency in gross negligence cases.[22] *Id*. at 734.

---

[22]The verdict against Dalworth was upheld despite the jury's finding that the driver was not grossly negligent.

There was proof in *Bulen* that from July to October 1994, when the accident happened, the driver had committed some fifty-six violations of company speed policies, six violations involving driving in excess of the allowed hours, and one missing log violation. *Id*. at 732. Federal regulations restricted driving hours to no more than seventy hours in eight days. Five of the hours violations occurred within the week preceding the accident. *Id*. The driver failed to log pre-trip and post-trip inspections, and that he was driving more hours than he was logging; this allowed the company to bill the customer for more miles and allowed drivers to be paid for more miles than company time and speed policies allowed. *Id*. Testimony showed that although company policy provided that a driver would be discharged after accumulating three safety violations, the driver in this case was not terminated, disciplined, or admonished, and the company did not send him cautionary letters concerning his violations. *Id*. Although Dalworth was aware of many technical safety violations by its driver, none but the excessive driving hours caused or contributed to the wreck. *Id*. at 733.

The company safety manager testified that company managers were aware of the driver's over-hours violations, that over-hours driving caused driver fatigue, that fatigue from excessive driving builds up to an almost inevitable loss of alertness in a driver, and that he would give the driver's overall driving record a grade of "F" so far as safety violations were concerned. The driver had over-hours driving violations on each of the four days preceding the collision. The evidence also showed that repeated safety violations by drivers create an extremely dangerous situation, that company managers knew about the situation but did not suspend, terminate, or admonish the driver, and that to do anything less than that would be inexcusable. The safety

35

manager testified that he knew an accident was almost inevitable if management failed to enforce safety practices vigorously. *Id.*

As in this case, Bulen was not shown to have exceeded permissible driving hours on the day of the accident. However, on the four days preceding the accident, Bulen violated the hours regulations for each of those days. Even so, the evidence showed that Bulen was not fatigued on the accident date, that he had a good night's sleep before the day of on the accident, and that he had several rest breaks on the accident date. *Id.*

Based on this evidence, this Court concluded that the jury could have reasonably found that the driver's cumulative safety violations caused a lack of alertness that contributed to his failure to see the stop sign in time to stop and avoid the collision. This Court further concluded that company managers could have reasonably foreseen a similar consequence from their failure to suspend or discipline the driver. *Id.* at 734.

As in *Bulen*, the evidence here shows that Rayner committed numerous log violations, including hours violations that tend to cause fatigue. Joe Tex was fully aware of these violations. Despite these similarities, though, two key factors distinguish this case from *Bulen*. First, this case is subject to a "clear and convincing" evidence standard, whereas *Bulen* applied the traditional no evidence standard to the gross negligence findings.[23] *Id.* at 731. So, while the *Bulen* court merely had to conclude that some evidence of probative force supported the finding in order to uphold it, this Court must determine that a reasonable trier of fact could have formed a firm belief or

---

[23]Under this standard, only the evidence and inferences that, when viewed in their most favorable light, tend to support the finding, are considered. Therefore, if any evidence of probative force supports the finding, the finding must be upheld. *Bulen*, 924 S.W.2d at 731.

36

conviction that its finding was true in order to uphold the gross negligence finding against Joe Tex. Second, there was evidence in *Bulen* that the driver had driven in excess of the mandated hours on four days preceding the accident, with a total of five hours' violations within the week preceding the accident. *Id*. at 732.

Here, Rayner's log book indicates that two days before the accident, he drove from Dallas to Mobile, but the bill of lading showed that he delivered a load to Sherman on that date. The trip from Dallas to Mobile, as reflected in the log book, shows exactly eleven hours of driving time. Sometime during that same day, Rayner presumably sidetracked to Sherman. There is no testimony indicating how many excess hours Rayner drove on July 21. But on the day before the accident and on the day of the accident, Rayner did not exceed his driving time. The evidence showed that he was well rested on the accident date.

While there was sufficient evidence before the jury to permit it to form a firm belief or conviction that Joe Tex was aware of the extreme risk of serious injury that Rayner's fatigued driving could cause, I believe that the evidence falls short on the issue of Joe Tex's knowledge that Rayner posed this type of risk to other drivers on the accident date. Although Joe Tex was aware that Rayner exhibited a pattern of over-hours driving, there is nothing in the evidence to meet the "clear and convincing," burden that Joe Tex knew that Rayner was fatigued on the accident date. While the jury might infer that Joe Tex knew that Rayner was fatigued on the accident date, I do not believe this evidence is sufficient to support that inference under the clear and convincing evidence standard.

I respectfully dissent.

Bailey C. Moseley
Justice

Date Submitted:     April 6, 2016
Date Decided:       July 13, 2016